**NATIONAL CASUALTY CO. v. HAMPTON.**

No. 13944.

Court of Civil Appeals of Texas. Dallas.
Dec. 3, 1948.

Rehearing Denied Dec. 29, 1948.

Dissenting Opinion on Rehearing
Jan. 4, 1949.

Chrestman, Brundidge, Fountain, Elliott & Bateman, of Dallas, for appellant.

White & Yarborough, of Dallas, for appellee.

BOND, Chief Justice.

The appellee, Virgil E. Hampton, plaintiff in the court below, brought this suit against appellant, National Casualty Company, defendant, to recover disability and hospitalization benefits, penalty, interest, and attorney's fee alleged to be due him under a health and accident policy issued by the defendant company. The primary question raised in the suit was to the effect that plaintiff's sickness was contracted and begun prior to the effective date of the policy, in that he was not in sound health, within the terms of the policy, but was suffering from tuberculosis; and, by reason thereof, the policy never became effective as a contract of insurance; hence no liability or obligation existed on the part of the insurance company except for the repayment of premiums, which were duly tendered to the insured; likewise refused.

The insurance clause of the policy covering appellee's claim provides: "Loss of time caused by sickness which is contracted and begun after this policy has been maintained in force for not less than thirty (30) days from its date, * * *." The policy was issued February 26, 1945, upon the basis of the insured's written application which was attached to and made a part of the policy, as a condition precedent, that he was in sound and healthy condition, mentally and physically, and, specifically, that he had never had and did not then have, among numerous named diseases, tuberculosis.

The defendant urged, in its answer denying liability, that the statements in the application of the insured were false, in that, "at the time of making said written application and prior thereto the plaintiff had tuberculosis, that the said false statements were of material fact and were material to the acceptance of the risk and to the hazard assumed by the defendant, in that, the defendant relied upon such statements being true and would not have issued said policy if it had known at said time the plaintiff had tuberculosis." It will be seen from the pleading and evidence generally that the sole issue for the determination of the jury impaneled to try the case was: Was the insured's sickness, tuberculosis, contracted and begun prior to the issuance of the policy, or was it present with the insured prior to the expiration of thirty days from date of the policy? The jury verdict was to the effect that the insured had never had tuberculosis prior to February 20, 1945, when he made the application for the insurance and that he did not contract or have the disease at any time within the thirty-day limitation; that is, to March 28, 1945. There was no pleading or proof; thus no issue submitted on actionable fraud on the part of the insured in knowingly or wantonly making the statements in his application that he did not have tuberculosis. On the jury verdict the court entered judgment in favor of the insured against the insurance company for policy coverage of twelve months, dating back to April 1945, for disability and hospitalization, legal penalty and interest, with attorney's fee.

Appellant's first points of error, upon which this appeal is predicated, challenge the action of the trial court, briefly: (1) In overruling its motion for instructed verdict; (2) in overruling its motion for judgment non obstante veredicto, and (3) in rendering judgment on the verdict; all grounded upon proper assignments that the evidence was overwhelmingly to the effect that the insured had contracted and was afflicted with the disease of tuberculosis prior to and during the time of the effective date of the policy; and (5) predicating error, incidentally, in admitting prejudicial testimony upon insurer's agent's acts and conduct in inducing the insured to make application for the insurance.

It is a tenet of our judicial system that courts of civil appeals, as well as all lower courts, are bound by decisions of the Supreme Court, even though such decisions are against the weight of authority elsewhere, or contrary to applicable principles and rules of law. When the Supreme Court has passed on questions which, in its opinion, are presented, all lower courts are bound by the decision, though they may entertain a contrary opinion, or the decision is against the overwhelming disclosures in the record, or even contrary thereto. However, in all instances decisions of the Supreme Court do not necessarily or conclusively carry conviction that the court is right. The Supreme Court has no jurisdiction of fact questions; thus a holding that the evidence is insufficient to show that the defendant is liable to the plaintiff, or that the evidence is overwhelmingly against the verdict of the jury in the estimation of a trial court, or court of civil appeals, presents questions of fact and not of law; hence such decisions are conclusive with the Court of Civil Appeals. Its jurisdiction is defined by the Constitution and enabling Acts of the Legislature, providing "that the decision of said courts shall be conclusive on all questions of fact brought before them on appeal or error." Constitution, Art. 5, sec. 6, Vernon's Ann. St., in part; R.S.Art. 1820.

To sustain the action of the trial court in the instant case, we would have to give way to the Supreme Court decision in Coxson v. Atlanta Life Ins. Co., 142 Tex. 544, 179 S.W.2d 943, and in Clark v. National Life & Acc. Ins. Co., 145 Tex. 575, 200 S. W.2d 820. In those cases the Supreme Court reversed this Court's unanimous decisions in which we held to the effect that the evidence in each case was wholly insufficient and overwhelmingly against the verdict of the jury; and, in effect, that the causes had been fully developed. In the Coxson case the Supreme Court granted application for writ of error upon the basis of conflict with its own decision in Vann v. National Life & Acc. Ins. Co., Tex.Com. App., 24 S.W.2d 347, and the former decision of this court in Taylor v. Atlanta Life

Ins. Co., Tex.Civ.App., 130 S.W.2d 889; thus assuming jurisdiction on the weight of the evidence as being in conflict with the Supreme Court's estimation of the facts in the two aforesaid cases.

 In the case of Layton et al. v. Hightower, Chief Justice, et al., 118 Tex. 166, 12 S.W.2d 110, our Supreme Court, as then composed, reaffirmed (1930) in Vann v. National Life & Acc. Ins. Co., supra, laid down the rule: "If facts in issue, which are involved in a particular ruling in each of the two cases, are materially the same in both cases, and the decision of the court in one case, as to the legal effect of such facts, is contradictory to that of the other court in the other case, then a conflict of decision occurs on a question of law which is 'involved and determined' in the two cases." Thus applying the rule, a holding that the evidence is insufficient or overwhelmingly against the defendant's liability to the plaintiff, is ordinarily held not to present a law question. Owens v. Tedford, 114 Tex. 390, 269 S.W. 418; Electric Express & Baggage Co. v. Ablon, 110 Tex. 235, 218 S.W. 1030, affirming Tex.Civ.App., 206 S.W. 717; Wilson v. Freeman, 108 Tex. 121, 185 S.W. 993, Ann.Cas.1918D, 1203. Similarly, where a Court of Civil Appeals treats a particular question as one of fact, a question of substantive law is not presented giving jurisdiction to the Supreme Court. And "where there is some evidence to support a finding or verdict of the jury, the question whether it is sufficient, in the estimation of the trial court or of the Court of Civil Appeals, to support such finding or verdict, is a question of fact, and not one of law." Electric Express & Baggage Co. v. Ablon, supra [110 Tex. 235, 218 S.W. 1033]; Choate v. San Antonio & A. P. Ry. Co., 91 Tex. 406, 44 S.W. 69.

In the light of above decisions, a careful study of this Court's opinion in Taylor v. Atlanta Life Ins. Co., supra; in the Coxson case, Tex.Civ.App., 177 S.W.2d 114 and in the Clark case, Tex.Civ.App., 197 S.W. 2d 869, all of which reflect our estimation of the evidence upon which the decisions were based, presents entirely dissimilar situations and weight to be given to the evidence in said cases. In the Taylor case,

eleven days after delivery of the policy of insurance, the insured died of pneumonia. Proof of death was made by the beneficiary named in the policy, in which she stated that the insured was confined to house with illness "two weeks prior to his death." The appeal hinged on the above statement being inconclusive to recovery, conflicting with other testimony touching the deceased's health. The jury verdict was to the effect that the insured was in sound health at the date of the policy, and the trial court denied recovery. We held that the expression "two weeks," employed by the beneficiary in her preliminary claim, was only a relative term, not so calculated to exactness as to preclude evidence of the true condition of deceased's health; hence we reversed the trial court and, the case having been fully developed, rendered judgment for the beneficiary. Writ dismissed; also approved in Coxson v. Atlanta Life Ins. Co., supra. In the Coxson case a much stronger fact question was presented in favor of the defendant insurance company. There the insured died of tuberculosis, the issue involved being that the insured was not "in good health," [177 S.W.2d 117] —a relative term, hence under the terms of the policy no liability existed. "Proof of death" was made by the beneficiary, supported by her oath and a physician's certificate showing that the insured had been afflicted with pulmonary tuberculosis prior to the issuance and delivery of the policy and that he had the disease at date of the policy; hence not in "good health." This declaration, standing unchallenged and purportedly controverted only by lay witnesses that the deceased looked all right, ate all right, slept all right, was a hard worker and never complained, and "so far as they could tell or know, his condition of health was good," we thought, substantiated the fact that the insured had tuberculosis. The beneficiary gave evidence that two months after date of the policy the deceased was taken to Parkland Hospital (a City-County institution for treatment of tuberculosis); that he was admitted on his application as an "emergency patient," and thereafter transferred to Woodlawn Hospital (another tuberculosis institution) where he remained until his death about a year later.

In the application for admission to the institution, the insured himself stated that he had been "sick for past 2½ years." Such "proof of death" and the "written declaration of the insured," together with the uncontroverted evidence disclosed by physical examination and X-ray films interpreted by skilled physicians and technicians showing that the condition of insured's lungs evidenced tuberculosis in its "emergency state" which extended far beyond the date of the policy, were, in our estimation, too conclusive to be successfully rebutted by evidence of interested lay witnesses that the insured appeared to them in good health. Hence, in the exercise of our judicial function, we concluded that the evidence was overwhelmingly in favor of the insurance company; thus reversed the action of the trial court; and, the case having been fully developed, rendered judgment for the insurance company. So, too, in the Clark case, another fact situation, based wholly upon the weight of the evidence. There the insured died of cerebral hemorrhage with hypotensive heart disease as a contributing cause. The policy of insurance was issued on the insured's application without medical examination. In the application the insured answered questions, pertinent to the decision, to the effect that he was in "good health," that he had had "no doctor," that he never had any "illness" and had never had "heart disease." The evidence presented in the appeal showed that the insured, prior to the date of the insurance policy, had been to an eminent physician for "consultation, medical attention and advice," and that this physician had been treating him intermitently, ten or twelve times, up to the time of his last illness, and within the contestible period of the policy; and that the doctor had been treating him for heart disease. Such evidence on the issue raised was uncontroverted, unless it can be said that the testimony of lay witnesses to the effect that the insured performed hard manual labor and his personal appearance and actions indicated that he was in sound health, rebuts the statement of the insured that "he had had no doctor," that he "had never had any illness," or raises issue that the insured did not know the statements

in his application were untrue. Indeed, if the insured had gone to his doctor for "consultation, medical attention and advice," ten or twelve times before the application for insurance was made out, may it be reasonably said that he did not know such was untrue? —that he did not know he had been ill, or that he had had a doctor attending him? Manifestly, we thought the insured had some knowledge of some physical ailment at the time he contracted for the insurance; else he would not have gone to his doctor for "consultation, medical attention and advice," inimical to the idea of his being in good health. True, the insured may not have known the character or nature of his illness, or that he had heart disease (few people would know that in its primary state); but evidently he did know he had had a doctor and that he had suffered some illness. In the interest of fairness, we thought he should have disclosed the history of his physical condition, as affected the insurer's risk. So, in estimating the weight of the evidence, we concluded that the deceased knew he had suffered illness; that he willfully made the false statements with the intent to deceive; hence perpetrated actionable fraud on the insurance company; and, the case having been fully developed, this Court reversed and rendered the cause in favor of appellant insurance company.

It is a fact of universal notoriety with which every one may fairly be presumed to be acquainted, that tuberculosis and heart disease are insidious in nature; leading all diseases which cause death to the human race; and that X-ray and photocardiagraph disclosures made by experienced technical diagnosticians are the most pronounced, if not the only sure method, of detecting these, as well as a great many other diseases, in their primary state. Especially so, when appearance and action of the diseased victim indicate negligible presence of such disease. Such is the testimony in the case at bar. The scientific disclosures of such modern instruments, read into the record by eminent physicians, should take their place as evidence of fact, as individual photographs, rather than as expert persuasive advocacy.

■ In the aforesaid cases we were not unaware of the reluctance felt by Appellate Courts to set aside a jury verdict when, in any view of the case, there is some evidence to support it. Nevertheless, when a verdict is palpably against the weight of the evidence, or where manifest injustice has been done, a court will not hesitate in the performance of its duty. The great and inexcusable delays incident to the disposition of causes in trial and Appellate Courts, have come, in many cases, to be a distinct reproach to the administration of justice. In Walsh v. Dallas Ry. & Terminal Co., 140 Tex. 385, 167 S. W.2d 1018, 1020, our Supreme Court, speaking through the late Chief Justice Alexander, had this to say as to its power to disturb the judgment of the Court of Civil Appeals: "The right to find that the evidence was insufficient to support the verdict was a matter exclusively within the jurisdiction of the Court of Civil Appeals, and we have no right to review that holding." In Bunch v. Thomas, 121 Tex. 225, 49 S.W.2d 421, the Supreme Court, by Chief Justice Cureton, also said: "The reversal was, in part at least, because of the insufficiency of the evidence to support the verdict. We must, therefore, permit the reversal to stand, as the question of the sufficiency of the evidence is not one within our jurisdiction." So, too, in the very recent case of Jackson et al. v. Hall, Chief Justice, et al., 214 S.W.2d 458, the Supreme Court, in an opinion edicted by Mr. Justice Folley, not yet reported [in State Reports], cited with approval the opinion in Lanford v. Smith, Chief Justice, 128 Tex. 373, 99 S.W.2d 593, 594. We quote: "It is the general rule in civil cases that, when the Court of Civil Appeals reverses the judgment of the trial court for lack of evidence in support thereof, it will not render judgment unless it appears that the case in that respect has been fully developed. * * * If the Court of Appeals determines that the judgment of the trial court is unsupported by the evidence, or that the evidence in support thereof is insufficient, its judgment should be one of remand and not one of rendition, unless it appears that the facts were fully developed at the trial appealed from."

In the light of the above holdings, perhaps the Supreme Court could and should have remanded the aforesaid cases to the Court of Civil Appeals for further consideration of the sufficiency of the evidence, as was done in Woods v. Townsend, 144 Tex. 594, 192 S.W.2d 884, 886, wherein the Supreme Court, speaking through Mr. Justice Brewster, said: "Since the court of civil appeals concluded that there was no evidence on that issue we must assume that it would adhere to its original holding that the testimony on the issue was insufficient, that question having been duly presented by assignment in that court. Wallace v. Southern [Cotton] Oil Co., 91 Tex. 18, 22, 40 S.W. 399. The result is, therefore, that we have what amounts to a holding that the testimony was insufficient on both issues; and to review that decision this court has no jurisdiction. Deen v. Birdville Independent School District, 138 Tex. 339, 159 S.W.2d 111." Accordingly, the Supreme Court reversed the Court of Civil Appeals and remanded the cause to that court for further proceedings.

■ In the case at bar the record on this appeal presents stronger preponderating evidence against liability of the appellant insurance company than that in the Coxson and Clark cases, and it does not appear that the cause has been fully developed, justifying a reversal and remand of the cause. In justice to the record, we, in extenso, and more, perhaps, than the occasion requires, summarize the facts: The liability contestible period under the terms of the policy ended March 28, 1945. In 1944 Mr. Hampton resided in Texas, employed at North American, an Army Assembly Plant in the City of Dallas, as a sheet metal worker. In the fall of that year, for reason not shown in the record, he voluntarily quit his work and moved to Portland, Oregon, where he secured similar employment at a shipyard, working there until about April 19, 1945. On February 20, 1945 Mr. Hampton executed a written application for the policy of insurance in suit, in which (pertinent here) he stated as a condition precedent, that he had never had and did not then have tuberculosis. Upon that application, on February 26, 1945, without medical examination, the

National Casualty Company at Detroit, Michigan, issued the policy, providing liability for health and hospitalization for disease occurring only after thirty days from date thereof. On April 5, 1945, seven days after the expiration of the thirty days, Mr. Hampton, according to his testimony, was offered by his employer a free X-ray checkup service at the City-County Tuberculosis Survey Center, Portland, Oregon; which offer he accepted and had X-rays made of his chest. Then two or three days later he was called back to the Tuberculosis Survey Center where he again posed for other X-ray films; then shortly thereafter was advised by Dr. Florence Brown (in charge of the Survey Center) that he was suffering with pulmonary tuberculosis. At Mr. Hampton's request, Dr. Brown forwarded the films to Dr. Paquet (Hampton's family physician), who discussed with him the condition of his lungs as revealed by the X-ray films; concluding therefrom and from a physical examination of Mr. Hampton, that he had tuberculosis and should quit work on account of his tubercular condition. Accordingly, on the next day Mr. Hampton did quit work and, on May 10 or 12, returned to Dallas where he applied to the City-County Parkland Hospital for medical services and X-ray diagnosis of his chest by the hospital physicians and technicians. Thereafter, in the course of a few days, on advice of Parkland Physicians, he applied for and was admitted to Woodlawn Hospital (another tuberculosis institution in Dallas) where further X-ray films were made of his chest, again revealing the tuberculosis of his lungs. So we think the evidence is conclusive that Mr. Hampton had tuberculosis at least since April 5, 1945. Hence the question here presented is: Did he have the disease prior to March 28, 1945? In determining the answer, we are confronted with the cardinal rule: If there is any probative evidence to warrant support of the verdict, this Court may not substitute its judgment for that of the trial court based upon such findings of the trier of facts.

Summarizing further upon the issue here involved: Mrs. Hampton, wife of the insured, testified that on and prior to March 28, 1945, her husband appeared to her to be in good health, his appetite was good, the color of his skin looked good, and as far as she knew there was nothing unusually wrong with him; he worked regularly, never complained. She further testified that on or about May 4, 1945, her husband went to Parkland Hospital; had an X-ray checkup of his chest; later to Woodlawn Hospital for like checkups; that he was confined as a patient in Woodlawn Hospital for about six months and while there she visited him regularly; observed his appearance; "he looked good to her;" just looked tired, having come from Portland, Oregon, to Dallas in an automobile; but still he had a good appearance, his color looked good, he had no cough, never complained. On cross-examination Mrs. Hampton testified that she had no training or experience in taking or reading X-ray films; was not a doctor or trained nurse, and that the only thing she knew about the health of Mr. Hampton was her observation of him about his home,—and to her he looked good; his color was good; his appetite was good; and from the time they left Oregon on or about May 4, 1945, until he left Woodlawn Hospital about six months thereafter, "he looked just as good when he went out to Woodlawn Hospital in May as he did in February when he signed the application for the insurance."

Mr. Hampton testified substantially as did his wife; that he had suffered no disease from the time he moved to Oregon to the time he made the application for insurance on February 20, 1945; had no trouble with his lungs or respiratory organs; and, too, his health was good on and before March 28, 1945; knew of nothing affecting his health, his appetite was all right, had no pains in his chest and the only thing he knew indicating anything wrong was in the latter part of April, 1945, when he was informed that the X-ray checkup of April 5th and other checkups two or three days later, revealed that he had tuberculosis. On Cross-examination Mr. Hampton testified that after the X-ray films were made of his chest he was advised by Dr. Brown of his condition, that he had tuberculosis; whereupon he went to his physician, Dr. Paquet, who, having also interpreted the

X-ray films, confirmed Dr. Brown's diagnosis and advised him to quit work. On that advice, he quit work and came to Texas, arriving at Dallas on or about May 4, 1945, and immediately applied to Parkland Hospital for examination, where again X-ray films were made of his chest, revealing the tubercular condition of his lungs. And then, on account of his condition as there related, he went to Woodlawn Hospital where he remained under the continuous care of Drs. Goggans and Chapman for five or six months, being discharged in October 1945. On redirect examination Mr. Hampton testified that because of his physical condition from the time he left Oregon to the present time, he had not been able to do manual labor; only worked three or four months in the first part of 1947.

The defendant, in defense of the suit, first offered as witness Dr. Matthew J. Noon, a licensed physician and Medical Director and General Supervisor of Woodlawn Tuberculosis Hospital at Dallas, who, after identifying the records offered in evidence relating to the medical history of Mr. Hampton at Woodlawn Hospital, testified that he was admitted on May 15, 1945; that the hospital technicians took X-ray films of him of that date; another dated July 4, 1945; another not dated; still another on August 8, 1945, and then another on September 8, 1945. On cross-examination Dr. Noon testified that he had been a tuberculosis diagnostician since 1931 and, from his experience and observation, a person may have primary tuberculosis when he has inhaled some germs, but not actively develop the disease; also that he may or may not be sick with the disease; however, most of them are sick; that there is an incubation period for such germs, the body reacting to the disease, although the party is not outwardly sick. Primary tuberculosis develops when the germ enters the lungs; that is the first effect of the tuberculosis bacilli. Such condition presents no outward sign; can only be told by a tuberculin test annd X-ray to see the result of it. The doctor further testified that he had never seen a person contract the disease of tuberculosis, and die of it in thirty days thereafter; but, that it is true many people

contract tuberculosis germs and live ten and twenty years; some contract it and are cured; many get the germs and have the disease for a long time without knowing that they have it; they do not appreciate their condition.

On redirect examination Dr. Noon testified that the process of taking X-ray pictures or films of a person's chest is an accepted customary method of diagnosing tuberculosis; that an X-ray will pick up early tuberculosis where the person has active or pulmonary tuberculosis; that an X-ray will not show germs or germ incubation; and no other test will do that. Primary tuberculosis, the doctor related, is hardly discoverable by X-ray or tuberculin test; however, in some cases, such can be detected; there is no way of telling definitely how long tuberculosis germs have been active in a man's lungs before the X-ray shows some evidence of the disease; however, X-ray is the best way of picking it up; X-ray films will show characteristic shadows which confirm the presence of tuberculosis; there are other things, of course, to convince of its presence, but the X-ray convinces positively.

Dr. Roy Goggans, Superintendent and Medical Director of Woodlawn Hospital, offered as witness by defendant, testified that he was licensed to practice medicine and surgery in 1913; that he practiced mostly in Dallas; that he has been in charge of the hospital during the last several years, specializing in diagnosis and treatment of tuberculosis; that he is a graduate of Vandell Medical School, 1912, and has been Superintendent of Woodlawn Hospital for 25 years. He further testified that, in large measure, the taking of X-ray pictures or films is an accepted method of detecting damage to the lungs by tuberculosis. He stated that Mr. Hampton was admitted to the hospital about May 1945, and at that time X-ray pictures or films were made of his lungs, showing definitely that he was suffering with tuberculosis. (At this point an X-ray film of Hr. Hampton, taken in May 1945, was introduced; defendant's Exhibit No. 1.) Dr. Goggans identified the film as being that of Mr. Hampton, and analytically interpreted it;

relating characteristic evidence of the presence of tuberculosis in both lungs; that is, positive shadows of the disease which had been in progress for six months at a minimum. He also identified and analyzed the X-ray film taken of Mr. Hampton's lungs by Dr. Brown at Portland, Oregon, on April 5, 1945, relating that it showed the same tubercular markings as portrayed in the above mentioned film which he made of Mr. Hampton in May 1945, evidencing the disease as not having progressed between the two dates; that the same pathological markings existed in the two films, indicating the duration of such disease to be of about several months, at least a six months period. On cross-examination Dr. Goggans testified that X-ray films are capable of depicting the disease of tuberculosis, and are recognized almost as photographs of individuals. He further testified that where germs of tuberculosis have progressed to the point of producing shadows—"spots on the lungs"—such can be identified; and they mean that the individual has tuberculosis; that the characteristics of tuberculosis in the lungs are different from other diseases; that the interpretation is mostly a matter of opinion, not infallible; the X-ray is only a means and aid, or agent, to a method of diagnosis, probably one of the most valuable of the whole system of diagnosis. On redirect examination Dr. Goggans testified that at the time Mr. Hampton was admitted to Woodlawn Hospital the X-ray films of his lungs evidenced a moderately advanced case of pulmonary tuberculosis and that the markings in his lungs showed conclusively that the disease existed on March 27, 1945, as the disease had sufficiently developed to have produced outward symptoms; and, probably, such outward symptoms were present on February 20, 1945, even three months before that date; and that the tuberculosis characteristics in his lungs occurred over a comparatively long period of time,—at least six months.

Dr. Florence Brown testified (by depositions) that she was a medical physician of fourteen years experience; a graduate of University of Illinois College of Medicine with Degree of Doctor of medicine; interned at Los Angeles County General Hospital, Los Angeles, California, Temple University, Philadelphia, Pennsylvania; doing special work since 1936 in diseases of the chest; teacher of medicine at the University of Oregon Medical School during the years 1940-1941; and is now and was on April 1945, the attending physician at City-County Tuberculosis Center, Portland, Oregon; and, further, that on or about April 5, 1945, an X-ray plate or film was made of Virgil E. Hampton's chest by the trained and experienced technicians of the City-County Tuberculosis Center of Portland, Oregon; that she examined the film (defendant's Exhibit No. 5), showing shadows, interpreted by her as evidencing tuberculosis; that other X-ray pictures were made of his chest at the Tuberculosis Center which also disclosed the presence of tuberculosis. On cross-examination Dr. Brown testified that she had no way of forming a definite conclusion as to how long Mr. Hampton had tuberculosis prior to April 5; she made no further examination other than interpreting the X-rays; and that such tuberculosis infection in the lungs of one individual may spread much more rapidly than in another.

Dr. Joseph S. Paquet testified by deposition, giving detailed evidence of his training and education, and as a practising physician; stated that he was educated at Duke University School of Medicine; interned at North Carolina State Tuberculosis Hospital, University and Hospital at Cleveland, Ohio; Desert Sanitarium at Tucson, Arizona; that on April 18, 1945, he personally examined Virgil E. Hampton who was then complaining of a productive cough, chest pains of three months duration, and loss of weight; that he analyzed a chest film which had been taken of Hampton at City-County Tuberculosis Center, which he interpreted as evidencing pulmonary tuberculosis; that Mr. Hampton's physical examination showed temperature of 99 degrees, blood pressure 120/80; chest showed increased tactile fremitus and rales on inspiration posteriorly in right lung field; post tussic rales were present at right apex; no percussion dullness was present; that the left lung field was clear of percussion and auscultation; that such examination revealed the presence of some type

of inflammatory process in the right lung field, manifesting tuberculosis; but, categorically, without X-ray evidence, he was unable to state definitely the length of time the tuberculosis had existed; he would not conjecture, but testified that the X-ray films evidenced calcium around the tuberculosis pulmonary lesions; he expressed the opinion, from his examination, that Mr. Hampton had the disease process present for approximately three months prior to his diagnosis, as revealed in the X-ray films; but would not state how long such tuberculosis existed prior to that date.

Dr. Davis Spangler testified, qualifying as to his education and practice of his profession, that he was a graduate of the Medical Department of the University of Texas; that he did postgraduate work with Mayo Clinic; in Kansas City, New York, Cleveland, and other points; and has had thirty-four years special practice in X-ray diagnosis and X-ray radium treatment in the City of Dallas. Then, after reviewing the X-ray film taken of Mr. Hampton's chest April 5, 1945 (plaintiff's Exhibit No. 5), at Portland, Oregon, stated that it evidenced an active tubercle in the right upper lobe of the lung and the lift upper lobe, and an old disease at the dome of the right diaphragm; that the disease was more in the right lung than in the left, showing evidence of the presence of the disease by whiteness in the film; that the increased density extends from the right lung, from the lower border of the second rib to the upper border of the first rib, and from the outer edge of the chest inward to the center or medias tinum; that on the left lung there is one large area approximately an inch in diameter, lying under the second rib and extending down part way in towards the middle of the fourth rib; and that such markings evidence tuberculosis. The doctor further testified that the film showed an enlargement in the center of the lung, where the bronchia enters, evidencing the disease in that area. Dr. Spangler further testified, after analyzing the chest film of Mr. Hampton taken on May 16, 1945 (defendant's Exhibit No. 1), by Dr. Goggans of Woodlawn Hospital, that there was practically no difference in the shadows in that film and those in the X-ray film taken April 5, 1945, in Portland, Oregon, the main difference being that the film of May 16th had more X-ray exposure than that of April 5, but that the process of tuberculosis is practically the same. The doctor testified further that from his experience in the regular practice of his profession, in diagnosing cases of tuberculosis based on X-ray evidence, the tuberculosis infection in Mr. Hampton's lungs had been present for a minimum of nine months and probably a year before April 5, 1945; but that such condition would not necessarily cause Mr. Hampton any discomfort, or knowledge, or feeling that he had something wrong with him.

On rebuttal by plaintiff, Dr. George E. Hurt qualified as an osteopathic physician and surgeon for more than twenty-five years; licensed by the Texas State Medical Board; premedical work at Southern Methodist University at Dallas, Texas; finishing interneship at Des Moines Hospital, Des Moines, Iowa; since which time has specialized in X-ray laboratory diagnosis. After looking at the film of April 5, 1945 (defendant's Exhibit No. 5), the doctor testified that he could not tell how long the clouded shadows in Mr. Hampton's lungs had existed; but, from his experience, such cloudy condition could appear within a few days. On cross-examination Dr. Hurt stated that he had no Medical degree from any college or university; then on re-cross examination by defendant, Dr. Hurt stated that in his opinion the X-ray film of April 5th shows tuberculosis; however, by the X-ray plate alone one could not tell whether or not it was an active tuberculosis atenuated or not, as all the cloudiness shown in the film could not be interpreted as tubercular; that some of the cloudiness appeared to be an acute respiratory infection which could have occurred in two or three days. Then in interpreting the film of May 15, (defendant's Exhibit No. 1), and another film of July 4, 1945, Dr. Hurt stated that the lung area showed a great deal more cloudiness in the film of April 5th, but such cloudiness had cleared up, showing, in his opinion, a probable respiratory condition. Then on redirect examination Dr. Hurt

stated that it is possible for a person to contract tuberculosis and have an immediate flare-up in his lungs within forty-eight hours afterwards; again, on re-cross examination, Dr. Hurt stated that the X-ray plate of April 5, 1945, shows an acute respiratory condition, not all of it tubercular; that the latent tuberculosis markings shown in the film; the respiratory tension clouding and congesting his lungs, started the active tuberculosis.

It will be seen that the testimony of Mr. and Mrs. Hampton evidences little value, if any, as relates to appellant's primary points of error: To Mrs. Hampton, her husband appeared as well after being in the hospital, admittedly suffering (and intermittently in bed) from tuberculosis, for six months, as he did when he made application for the insurance; to her, he looked good, had good appearance, his color looked good, he had no cough, never complained, his appetite was good; and "he looked just as good when he went out to Woodlawn Hospital in May as he did in February when he signed the application for the insurance." Then, too, Mr. Hampton's testimony reflects his feelings and actions not materially different at the time he made the application on February 20, 1945 and during the thirty-day contestible period of the policy, as compared with his condition during the time he was in Woodlawn Hospital under treatment by qualified physicians for tuberculosis. He gave no evidence of his condition being materially different from what it previously had been. In pleading, the plaintiff alleged that "In April, 1945, he became totally disabled and sustained total confining disability by reason of a respiratory ailment and disease and was placed under the care of a physician; that from and since said date * * * he has been wholly and continuously disabled * * *"; and the jury verdict is to the effect that for 18 months he was "under the care and personal attendance of a legally qualified physician or surgeon, since the time such disability occurred." So, in the light of the record, we think the testimony of Mr. and Mrs. Hampton, standing alone, adversely to his pleadings and findings of the jury, does not sustain the verdict.

Thus, in order to sustain the action of the trial court, we must resort to the testimony of Dr. Hurt, who had neither seen Mr. Hampton nor had him under his care and attendance, that some of the characteristic shadows or markings portraying tuberculosis in Mr. Hampton's lungs, as revealed by the X-ray films in evidence, could have occurred from other ailments and progressed to the extent shown in the films in forty-eight hours before the films were taken; as against the testimony of Mr. Hampton's physicians, who had him under their constant care and personal attendance, that the presence of tuberculosis in his lungs existed at and prior to the contestible period of the policy. We think the evidence is overwhelmingly against the verdict of the jury, tantamount to insufficient evidence to sustain liability; hence the judgment of the court below should be reversed and the cause remanded for further consideration.

Plaintiff's further point of error, based upon prejudicial testimony as to the action of the insurance agent in continuously and persistently urging the insured to make the application for insurance, thus inducing him, reluctantly or against his will, to become the insured, should be sustained. Such testimony was not admissible, and the continued and persistent efforts of the attorney for the plaintiff, over defendant's objections and the court's numerous rulings to prevent such prejudicial matters getting before the jury, are not commendable and should not have been indulged in by the able and experienced attorney. The court, finally, upon the persistent efforts of plaintiff's attorney to get such matters before the jury, reversed its ruling and permitted introduction of the testimony on the theory that defendant had alleged fraudlent conduct on the part of the plaintiff in making the application for the insurance, in that, "at the time of making said written application, and prior thereto, the plaintiff had tuberculosis," which was false. Such allegation does not charge actionable fraud on the part of the plaintiff, in that he knowingly or wantonly made the untrue statement to induce the execution of the policy of insurance, as to permit the introduction of the objectionable testimony. We deem it un-

necessary to relate in detail the testimony; same should not occur on another trial.

Judgment of the court below is reversed and the cause remanded.

YOUNG, Justice (dissenting on Rehearing).

Upon review of the record I conclude that the factual basis in support of plaintiff's judgment is fully as substantial as that presented in Coxson v. Atlanta Life Ins. Co., 142 Tex. 544, 179 S.W.2d 943, and if a recovery on the policy was there sustainable, so should be the ruling here. In its own narration of facts, the majority opinion plainly demonstrates that the testimony adduced on behalf of plaintiff was of *probative value*; the majority, on the other hand, giving conclusive effect to opinions of expert witnesses in their interpretation of X-ray pictures. Surely, under the facts and circumstances of this case and express language of Judge Folley in the Coxson appeal, a conclusive effect cannot be attached to the testimony of these experts.

Neither was there any question about admissibility of the testimony on part of plaintiff that defendant's agent solicited the insurance on his own initiative and without plaintiff's invitation. Final question in the application signed by Hampton reads: "Do you understand and agree that the right to recovery under any policy which may be issued upon the basis of this application shall be barred in the event that any of the above statements, made with *actual intent to deceive* or material either to the acceptance of the risk or to the hazard assumed by the Company, is false?" (Emphasis mine) Defendant pled that plaintiff's answers to questions 8(a) and (b) of said aplication (concerning good health) were false as herein above quoted in majority opinion. The following issues, answered in the negative, formed a part of the court's charge without objection: (13) "Do you find from a preponderance of the evidence that such statement and answer by the plaintiff, to the effect that he was in a sound and healthy physical condition, was made by him with the actual intention of deceiving the defendant?" (15) "Do you find from a preponderance of the evidence that such statement and answer by the plaintiff,

to the effect that he had never had and did not then have tuberculosis, was made by him with the actual intention of deceiving the defendant?"

Plaintiff herein having been charged with fraudulent conduct in connection with the instant application, he was clearly entitled to the benefit of all facts and circumstances attendant upon its execution. "Conversely a person charged with fraudulent dealing may prove the attending facts in order to show that the entire transaction was open and free from misrepresentation or from invalidating influences." 20 Tex.Jur., p. 160.

Furthermore, to the conversation between plaintiff and insurance solicitor, which the majority now rules as "prejudicial," defendant objected on the ground merely that the testimony was "immaterial and irrelevant." Such has been uniformly held to be a general objection and insufficient basis for complaint on appeal. Capitol Hotel Co. v. Rittenberry, Tex.Civ.App., 41 S.W.2d 697; Peerless Oil & Gas Co. v. Teas, 138 Tex. 301, 158 S.W.2d 758; Aetna Casualty & Surety Co. v. Davis, Tex.Civ.App., 196 S.W. 2d 35.

In my opinion, plaintiff's judgment should be affirmed.