NO.
12-05-00223-CV

 

IN THE COURT OF APPEALS

 

TWELFTH COURT OF APPEALS DISTRICT

 

TYLER, TEXAS

 

MILLARD VAUGHN AND

BARBARA VAUGHN,         §          APPEAL
FROM THE 273RD

APPELLANTS

 

V.        §          JUDICIAL
DISTRICT COURT OF

 

PAUL DRENNON AND

MARY DRENNON,  §          SABINE
COUNTY, TEXAS

APPELLEES




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



OPINION

            Millard and
Barbara Vaughn appeal from a permanent injunction entered against them in a
suit filed by their neighbors, Paul and Mary Drennon, involving damages caused
by water runoff and Millard Vaughn’s unneighborly behavior.  The Vaughns complain of the breadth and lack
of specificity of the order as well as a lack of evidence to support it.  We reverse in part and affirm in part. 

 

Background








            The
Drennons purchased a one half acre lot in Sabine County in 1972, began building
the house in 1975, and made it their permanent residence in 1982.  That property shares a boundary with property
purchased by the Vaughns in 1995.  The
property owned by the Vaughns is higher in elevation.  Additionally, Millard Vaughn made some
changes to the topography of his property near its boundary with the Drennon
property.  Consequently, water drains
from the Vaughn property onto the Drennon property.  On December 7, 2004, after finding water
damage to their property, the Drennons filed suit alleging nuisance,
intentional infliction of emotional distress, and invasion of privacy.  At the same time, the Drennons sought a
temporary restraining order and a temporary injunction.  On the same day, the trial court issued a
temporary restraining order immediately restraining the Vaughns from:

 

a.             damaging
or destroying the Drennons’ personal property;

 

b.             damaging
or destroying the Drennons’ real estate;

 

c.             threatening
or harassing the Drennons;

 

d.             coming
within 75 feet of the Drennons at any time;

 

e.             continuing
work of any kind on the Vaughns’ real property pending final disposition of
this matter;

 

f.             communicating
with the Drennons in any manner;

 

g.             causing
bodily harm to the Drennons;

 

h.             destroying,
disposing of, or altering any prior communication with the Drennons;

 

i.              instituting
any action in any other county, state, or nation attempting to obtain temporary
or permanent orders concerning the same factual and legal scenario contained
within this lawsuit; and/or

 

j.              disturbing
the Drennons’ peace.

 

            On
March 3, 2005, after a hearing, the trial court issued a temporary injunction
enjoining Millard Vaughn from all of the acts prohibited by the temporary
restraining order except it restricted Vaughn’s work on his property in an area
within 200 feet of the Drennons’ property line and it omitted the provision
prohibiting Vaughn from filing suit.  The
trial court denied the temporary injunction as to Barbara Vaughn.  After a trial before the court the next
month, the court permanently enjoined Millard and Barbara Vaughn from all the
acts prohibited by the temporary injunction except the final judgment omitted
the restriction from working on the Vaughns’ property.  The judgment ordered the Vaughns to “lower
the elevation of their land between eight (8) feet and twenty (20) feet east of
Defendants’ west boundary line at least three (3) feet wide, the bottom of
which to be eighteen (18) inches lower in elevation than that of the land along
Defendants’ west boundary line perpendicular thereto.”  Also, the court awarded the Drennons
$4,000.00 for actual damages and $3,000.00 for punitive damages.

                                                                        

Applicable
Law

            Whether
to grant a permanent injunction is ordinarily within the sound discretion of
the trial court and, on appeal, review of the trial court’s action is limited
to the question of whether the action constituted a clear abuse of discretion.  Computek Computer & Office
Supplies, Inc. v. Walton, 156 S.W.3d 217, 220 (Tex. App.–Dallas 2005,
no pet.).  Because an injunction is an
equitable remedy, a trial court weighs the respective conveniences and
hardships of the parties and balances the equities.  Id.  Injunctive relief may be granted only on a
showing of a wrongful act, imminent harm, irreparable injury, and the absence
of an adequate remedy at law.  Priest
v. Texas Animal Health Comm’n, 780 S.W.2d 874, 875 (Tex. App.–Dallas
1989, no writ).  








            An
injunction should be broad enough to prevent a repetition of the evil sought to
be corrected.  Hitt v. Mabry,
687 S.W.2d 791, 795 (Tex. App.–San Antonio 1985, no writ).  However, it must not be so broad as to enjoin
a defendant from activities that are a lawful and proper exercise of his
rights.  Id. at 796.  Although an injunction is a preventative
device, injunctive relief is improper where the party seeking the injunction
has mere fear or apprehension of the possibility of injury.  Frey v. DeCordova Bend Estates Owners
Ass’n, 647 S.W.2d 246, 248 (Tex. 1983). 
A prerequisite for injunctive relief is actual injury, the threat of
imminent harm, or another’s demonstrable intent to do that for which injunctive
relief is sought.  Tri-State Pipe
and Equip., Inc. v. Southern County Mut. Ins. Co., 8 S.W.3d 394,
401 (Tex. App.–Texarkana 1999, pet. denied).

            The
owner of higher property is entitled to have water pass to lower land as long
as the water follows its usual course untouched by human hands.  Bunch v. Thomas, 121 Tex. 225,
232, 49 S.W.2d 421, 424 (1932).  If a
party diverts water onto the land of another in a manner causing him injury,
the party doing so is liable for damages. 
Tex. Water Code Ann. §
11.086(a) (Vernon 2000); Dietrich v. Goodman, 123 S.W.3d 413, 418
(Tex. App.–Houston [14th Dist.] 2003, no pet.).

 

Elevation of
Vaughns’ Property

            In
their first issue, the Vaughns assert that by ordering them to alter the
natural slope of their property, the trial court granted relief beyond that
prayed for by the Drennons and infringed on the Vaughns’ right to have the
water drain off their property in its natural state.  In their second issue, the Vaughns contend
that this requirement is too vague.

Relief Prayed For

            A
trial court may not grant relief in the absence of pleadings supporting such
relief.  Holmstrom v. Lee,
26 S.W.3d 526, 532 (Tex. App.–Austin 2000, no pet.).  The purpose of pleadings is to give the
parties notice of claims, defenses, and relief sought.  See Perez v. Briercroft Serv. Corp.,
809 S.W.2d 216, 218 (Tex. 1991).  A
prayer must be consistent with the facts stated as a basis for relief.  Kissman v. Bendix Home Sys., Inc.,
587 S.W.2d 675, 677 (Tex. 1979).  Even
though a party requests special relief, if he also includes a prayer for
general relief, he may be awarded the relief to which he is entitled under his
pleadings and the evidence.  Pennsylvania
Ins. Co. v. Storbeck & Gregory, 391 S.W.2d 811, 813 (Tex. App.–Fort
Worth 1965, no writ).

Petition

            In
their petition, the Drennons alleged that the Vaughns “cleared and removed
trees and all undergrowth from the property, bulldozed and tilled the soil, and
altered the natural slope of land, thus negatively affecting the natural
drainage of surface water.”  They further
alleged that the Vaughns constructed dams that act as a funnel increasing the
speed of, and concentrating, rain and other surface water runoff from the
Vaughns’ property onto the Drennons’ property. 
The Drennons asked the court to enjoin and restrain the Vaughns from
committing the acts described in the petition. 
They also prayed “[f]or such other and further relief, both at law or in
equity, to which Plaintiffs may be justly entitled.”  In other words, the Drennons asked the court
to make the Vaughns stop directing the flow of water onto the Drennons’
property.

Evidence

            Paul
Drennon testified that he has had “surface water problems” since he bought the
property.  Rain water has been flowing
onto his property from the property now owned by the Vaughns since the
1980s.  Until 2004, ditches adequately
prevented a water problem. Before the Vaughns purchased the property, Drennon
and some neighbors installed a pipe that ran across his property and onto what
is now the Vaughns’ property.  That pipe
drained water that came off the Vaughns’ property onto the Drennons’ property,
depositing it on a lower part of the Vaughns’ property.  From there it flowed to the lake.  Drennon believed a neighbor had gotten
permission from the previous owner to divert the water onto that property.  After Vaughn bought the property, he removed
that pipe.  Drennon has run a pipe into
the culvert in the road in front of his house to drain water.  Drennon also has ditches on his property
diverting water.  Drennon testified that
Vaughn had allowed him to dig a ditch on the Vaughns’ property parallel to the
common fence so the water would run down the hill and into the lake.  However, Vaughn did not allow Drennon to
maintain the ditch, and it filled in. 

            Harold
Crocker, who lives three houses from Drennon, testified that, before the
Vaughns purchased their property, he helped lay the pipe on the Drennons’
property that deposited water draining from the Vaughns’ property back onto the
Vaughns’ property.  At the same time, he
dug a ditch along the back of the Vaughn property to protect the Drennon
property and their next door neighbor. 
In the summer of 2004, Vaughn removed trees from a portion of his
property, clearing out a twenty-five to thirty foot area from the top of the
hill down to the chain link fence marking the Vaughn/Drennon property
line.  Also, Vaughn built four or five
dirt dams behind the Drennons’ fence that funneled water into the Drennons’
yard.  He also placed timbers
perpendicular to the fence, which helped funnel more water onto the Drennons’
property and sped up the velocity of the water. 


            When
cross examining Drennon, the Vaughns’ attorney asked him what he wanted the
judge to do in this case.  Drennon
responded that he wanted the judge to correct this problem, he wanted the dirt
and timbers removed, and he wanted “it fixed where the water won’t run off that
hill down there and back onto [his] property.” 
He wanted whatever it takes to stop the water from being funneled across
his property and “whatever it takes to fix it.” 
Dwayne Husband, an employee of the Sabine River Authority, testified that
it would help if Vaughn removed some of the structures he has erected on his
property, and they need a drainage ditch to stop the water from coming across
the Drennons’ property.  He said the
water needs to be diverted.

            William
Tatum, who owns a home near the Drennons’ and the Vaughns’ properties,
testified that Vaughn built two levies to divert water to flow through the
Drennons’ backyard, and removal of those levies would reduce the volume or
velocity of water coming off the Vaughns’ property onto the Drennons’
property.  He agreed with counsel for the
Vaughns that if the Drennons put a ditch at the back of their property and
brought it around between their house and their next door neighbor’s house, it
would alleviate some of the problem.

            Mary
Drennon testified that she wanted the dams and dirt moved and she wanted it “fixed
where there will never be anymore flooding on [her] property or in [her] home
again.”  She explained that the ditch
they put on their property does no good, but if Vaughn removes the dams and
puts the soil back like it was, then he could put a ditch or retaining wall on
his property to hold the water on his property. 
She stated that there needs to be some kind of construction, such as
culverts or ditches, behind their property, that is permanent and continuously
maintained.  She admitted knowing nothing
about “dirt work” but wanted “whatever it would take” to permanently eliminate
the flooding.

            Earnest
Vaughn, Millard’s brother, lives across the street from the Drennons.  He testified that a ditch on his brother’s
property behind the Drennons’ property would divert water to the property owned
by the McGees, who live next door to the Drennons.  If a ditch were dug down to the McGee
property, the water would drain onto the Crocker property.  He explained, “[W]hen you put a ditch in,
that’s sandy loam up there, a small amount of water you can bury a truck in
that sucker overnight.”  In other words,
because the soil is sandy, a ditch will be eroded out, not filled in.

            Millard
Vaughn testified that, in 1996 or 1997, after Drennon requested to till a ditch
on the Vaughns’ property to divert water, Vaughn dug a ditch.  It was two feet wide, running the whole
length of the Drennons’ property, one hundred fifty feet.  Then he turned it and brought it into his
property another one hundred fifty feet so the ditch would not carry water to
McGee’s or Crocker’s property.

Discussion

            The
Drennons wanted the dams removed so that Vaughn was not deliberately diverting
water onto their property.  They also
wanted the problem of excess runoff permanently corrected.  The pleadings and evidence support the trial
court’s order that the Vaughns lower the elevation of their land along their
west boundary line.  See Kissman,
587 S.W.2d at 677; Pennsylvania Ins. Co., 391 S.W.2d at 813.  In their brief, under their argument for
issue three, the Vaughns concede that “the trial court could have reasonably
found that Millard Vaughn diverted the surface water on his property in such a
manner that it flowed onto the Drennons’ property in a manner that was not ‘natural,’
justifying an injunction designed to restore the water to its natural flow.”

            The
Vaughns argue that the requirement to lower the elevation of their land is an
order to alter the natural flow of water off their land and infringes on their
right to have surface water drain in its natural state onto lower estates.  The Drennons respond that the trial court was
merely attempting to restore the natural condition of the land prior to the
Vaughns’ actions.  

            The
trial court ordered the Vaughns to lower the elevation of their land along the
east/west boundary shared with the Drennons by eighteen inches.  This is consistent with Mary Drennon’s
testimony that Vaughn had piled dirt against their gate eighteen inches
tall.  The petition complained of the
Vaughns’ acts of redirecting the flow of water and included a prayer for
general relief.  The evidence supports
the petition.  Therefore, the court did
not grant relief beyond that prayed for. 
See Pennsylvania Ins. Co., 391 S.W.2d at 813.  Because the effect of the court’s order to
lower the elevation of their land is to recreate the natural flow of water as
it was before Vaughn changed the natural flow, the trial court’s order does not
infringe on the Vaughns’ right to have surface water drain onto the Drennons’
property.  See Bunch, 121
Tex. at 232, 49 S.W.2d at 424.  The trial
court did not enjoin the Vaughns from engaging in lawful activities by having
them restore the natural condition of the land. 
See Hitt, 687 S.W.2d at 796.  The trial court did not abuse its discretion
in granting this injunctive relief.  See
Walton, 156 S.W.3d at 220.  We
overrule the Vaughns’ first issue.

Vagueness

            The
Vaughns assert that the portion of the order requiring them to lower the
elevation of their land should be stricken due to vagueness.  They argue that the order does not describe
with particularity the locations at which they must lower the elevation of
their property.  In support of this
argument, they rely on Rule of Procedure 683, which requires a description “in
reasonable detail” of the act sought to be restrained.

            An
injunction must be definite, clear, and concise, leaving the person enjoined in
no doubt about his duties, and should not be such as would call on him for
interpretations, inferences, or conclusions. 
Gulf Oil Corp. v. Walton, 317 S.W.2d 260, 264 (Tex. Civ.
App.–El Paso 1958, no writ).

            The
complained of paragraph states:

ADDITIONALLY, the
Court ORDERS that Defendants Millard Vaughn and Barbara Vaughn lower the
elevation of their land between eight (8) feet and twenty (20) feet east of
Defendants’ west boundary line at least three (3) feet wide, the bottom of
which to be eighteen (18) inches lower in elevation than that of the land along
Defendants’ west boundary line perpendicular thereto.

                                    

            The
trial court ordered the Vaughns to lower the elevation of their land at some
distance east of the Vaughns’ west boundary line.  Possibly, the phrase “between eight (8) feet
and twenty (20) feet” means that the digging should be done at least eight feet
east of the boundary but no more than twenty feet east of the boundary.  But we are not allowed to use
conjecture.  See id.  The lowered area is to be three feet wide and
eighteen inches deep.  Considering that
the timbers which must be removed are perpendicular to the boundary, it is
difficult to understand how lowering the elevation in a manner that is
perpendicular to the boundary could be helpful. 
The phrase “perpendicular thereto” is confusing.  The order is not clear and does not contain
sufficient detail for the Vaughns to determine exactly what the court wants
them to do.  See Tex. R. Civ. P. 683; Walton,
317 S.W.2d at 264.  We sustain the
Vaughns’ second issue.

 

Prohibitions Concerning
Distance, Disturbing the Peace, 

Threats, and
Communications

            In
their third issue, the Vaughns assert that the trial court’s prohibitions
against their coming within seventy five feet of the Drennons, disturbing the
peace of the Drennons, and threatening or harassing the Drennons are
unsupported in the evidence.  They argue
that there is no evidence that Barbara Vaughn did anything or that Paul Drennon
was harassed or intimidated.  They
further argue there is no evidence of intentional infliction of emotional distress
and neither pleadings nor evidence of invasion of privacy.  In their fourth issue, they assert that the
injunction’s prohibitions against disturbing the peace and threatening or
harassing are too vague.  In their fifth
issue, the Vaughns contend that, because there is no evidence that they
committed intentional infliction of emotional distress or invasion of privacy,
there is no civil wrong to underlie the portions of the injunction relating to
communications and they should be stricken. 
In their seventh issue, the Vaughns assert that Barbara Vaughn did not
do anything to the Drennons or commit any tort and therefore the judgment
against her should be reversed.

Standard of Review

            If
an appellant is attacking the legal sufficiency of an adverse finding on an
issue on which he did not have the burden of proof, the appellant must
demonstrate on appeal that there is no evidence to support the adverse
finding.  See Croucher v. Croucher,
660 S.W.2d 55, 58 (Tex. 1983).  In
reviewing no evidence issues, the reviewing court views the evidence in the
light most  favorable to the verdict,
indulging every reasonable inference that would support it.  City of Keller v. Wilson,
168 S.W.3d 802, 822 (Tex. 2005).  The
reviewing court must credit evidence that supports the verdict if a reasonable
fact finder could and disregard contrary evidence unless a reasonable fact
finder could not.  Id. at
827.  We must determine whether the
evidence at trial would enable a reasonable and fair minded person to find the
facts at issue.  Id.  The fact finder is the sole judge of the
credibility of the witnesses and the weight to give their testimony.  Id. at 819.  A challenge to the legal sufficiency of
evidence will be sustained when, among other things, the evidence offered to
establish a vital fact does not exceed a scintilla.  Kroger Tex. Ltd. P’ship v. Suberu,
49 Tex. Sup. Ct. J. 592, 2006 Tex. LEXIS
441, at *9 (Tex. May 5, 2006).  Evidence
does not exceed a scintilla if it is so weak as to do no more than create a
mere surmise or suspicion that the fact exists. 
Id.

Evidence

            Paul
Drennon testified that Millard Vaughn harassed them “continuously since this
all started; some almost everyday.”  He
said Vaughn watched them.  Vaughn sat
across the road in a truck and watched their window with binoculars.  Vaughn removed a pipe that ran from the
Drennons’ property onto the Vaughns’ property. 
That pipe had been placed there prior to the time the Vaughns purchased
the property, for the purpose of draining water off the Drennons’ property that
had originated from the Vaughns’ property.

            Paul
Drennon testified that he did not know of anything Barbara Vaughn had done to
cause any damages and that she had done nothing physically.  He thinks she knew what was going on because
she is married to Vaughn and is involved in some way.  He believes she probably did some typing, but
he cannot say for sure what she did.

            Mary
Drennon testified that Vaughn would sit in front of their house for hours
looking at them.  He also looked at them
through binoculars from his property and took pictures.  This began in the latter part of October
2004.  Because of his activities, Mary
does not do much of anything outside anymore. 
She does not work in the garden or take walks.  She fears going out on her porch.  If she is outside and hears Vaughn’s truck,
she goes back inside.  One day when she
was walking, he stopped near her, and she saw guns in his truck.  When she asked why he was carrying guns, he
said he had them to shoot animals, varmints, birds that destroy his property,
and people he does not like.  She took
this as a threat.  This incident happened
shortly after he told her not to walk down his road anymore, a request that led
her to believe he did not like her anymore. 
At a later time when she was outside, he drove up, opened the door of
his truck, and cleared his throat.  She
saw guns in his truck then.  She
testified that she is afraid of Millard Vaughn. 


            After
a big rain in early December, Mary was taken to the hospital for treatment of
an anxiety attack.  She testified that
Vaughn harassed her by driving by their house, parking out front with
binoculars, and taking pictures.  Mary
also testified that Vaughn accused her of taking vegetables from his brother’s
garden and told her not to go to his brother’s place anymore.  For weeks, Vaughn watched them with
binoculars.  He looked directly in her
kitchen window at her with binoculars.

            She
said she cannot function or take care of her husband’s needs or her household
needs.  She has been deprived of her activity,
her life, and her time.  She can no
longer do the things she had always done before because she is not
functioning.  She explained that she and
Paul act “terrible” toward each other. 
They are short tempered, hostile, stressed out, no longer do things
together, and cannot focus on anything. 
Mary testified that the stress made it terribly hard on Paul.  He cannot do what he wants to do.  He stays upset all the time.  He is stressed by what has been done to his
property and worries about what will happen next.  Mary said she will always fear Millard, will
never be the same person again, will never be able to do what she has always
done, will never be free, and will never be Mary again.

            Mary
testified that Barbara has never been unkind to her, never said anything ugly
to her, and did nothing to construct the dams. 
Mary also said Barbara did not carry guns, make threats, divert water,
harass them, or invade their privacy. 
Barbara typed an email and helped with the paperwork.  Mary felt that Barbara knows about what
Vaughn did and, because they are husband and wife, that Vaughn and Barbara are
both responsible.

Nuisance

            An
invasion of one’s interest in the use and enjoyment of land resulting from
another’s interference with the flow of surface water may constitute a private
nuisance.  City of Princeton v.
Abbott, 792 S.W.2d 161, 166 (Tex. App.–Dallas 1990, writ ref’d n.r.e.)
(op. on reh’g).  The Drennons pleaded a
cause of action for nuisance, complaining of Millard Vaughn’s acts of moving
dirt and building dams that caused water to run onto their property in damaging
volumes.  The evidence of nuisance is set
out above.  However, the court’s order
enjoining the Vaughns from threatening, harassing, coming within seventy-five
feet of the Drennons, communicating with the Drennons, destroying prior
communications, and disturbing the peace of the Drennons is not supported by
evidence of nuisance.  Further, neither
Paul nor Mary Drennon testified as to any act by Barbara Vaughn constituting
nuisance.  

Intentional Infliction of Emotional
Distress

            The
elements of the tort of intentional infliction of emotional distress are 1) the
defendant acted intentionally or recklessly, 2) the conduct was extreme and
outrageous, 3) the actions of the defendant caused the plaintiff emotional
distress, and 4) the emotional distress suffered by the plaintiff was
severe.  Suberu, 49 Tex.
Sup. Ct. J. 592, 2006 Tex. LEXIS 441, at *15. 
Courts must determine as a threshold matter whether the defendant’s
conduct may reasonably be regarded as so extreme and outrageous as to permit
recovery.  Brewerton v. Dalrymple,
997 S.W.2d 212, 216 (Tex. 1999).  To be
extreme and outrageous, conduct must be so outrageous in character and so
extreme in degree, as to go beyond all possible bounds of decency, and to be
regarded as atrocious, and utterly intolerable in a civilized community.  Id.  The test for determining what conduct is
extreme and outrageous is essentially a subjective one.  Twyman v. Twyman, 855 S.W.2d
619, 629 (Tex. 1993) (Hecht, J., concurring and dissenting).  Insensitive or rude behavior does not amount
to outrageous behavior.  Haynes
& Boone, L.L.P. v. Chason, 81 S.W.3d 307, 309 (Tex. App.–Tyler
2001, pet. denied).  Mere insults, indignities,
threats, annoyances, petty oppressions, or other trivialities do not rise to
the necessary level of extreme and outrageous conduct.  GTE Southwest, Inc. v. Bruce,
998 S.W.2d 605, 612 (Tex. 1999).  Courts
consider the context and the relationship between the parties.  Chason, 81 S.W.3d at 310.

            Watching
people, driving by their house, and taking pictures of their property are not
beyond the bounds of decency, atrocious, or intolerable acts.  See Brewerton, 997
S.W.2d at 216.  Having guns visible in a
vehicle in the manner set out above is not outrageous behavior.  Millard Vaughn’s behavior and the comment he
made in response to Mary’s question about the guns are insensitive and rude,
but this does not amount to outrageous behavior.  See Bruce, 998 S.W.2d at
612.  Even if his actions can be
considered threats, this conduct cannot be characterized as extreme and
outrageous.  Id.  Neither Paul nor Mary Drennon provided
evidence of extreme or outrageous conduct by Barbara Vaughn.  Due to the absence of extreme and outrageous
conduct, the record does not support a finding that either Millard or Barbara
Vaughn is guilty of intentional infliction of emotional distress.  See Brewerton, 997 S.W.2d at
216.  

Invasion of Privacy

            A
common law right to privacy exists under Texas law.  Billings v. Atkinson, 489
S.W.2d 858, 860 (Tex. 1973).  The Texas
Constitution guarantees the sanctity of the home and person from unreasonable
intrusion.  Texas State Employees
Union v. Texas Dep’t of Mental Health & Mental Retardation, 746
S.W.2d 203, 205 (Tex. 1987).  The
elements that must be established for an invasion of privacy claim are 1) an
intentional intrusion, physically or otherwise, upon another’s solitude,
seclusion, or private affairs or concerns, which (2) would be highly offensive
to a reasonable person.  Valenzuela
v. Aquino, 853 S.W.2d 512, 513 (Tex. 1993).  When assessing the offensive nature of the
invasion, courts further require the intrusion to be unjustified or
unwarranted.  Billings, 489
S.W.2d at 860.  This type of invasion of
privacy is generally associated with either a physical invasion of a person’s
property, eavesdropping on another’s conversation with the aid of wiretaps,
microphones, or spying.  Clayton v.
Wisener, 190 S.W.3d 685, 696 (Tex. App.–Tyler 2005, pet. denied). 

            We
will assume without deciding that the Drennons properly pleaded a cause of
action for invasion of privacy. The Drennons complained that Millard Vaughn
watched them through binoculars.  There
is no evidence that he entered their property or walked up to their house to
look into the windows.  Mary testified
that Vaughn watched them from his own property and from his brother’s house,
which is across the street from the Drennons. 
She explained that her kitchen sink is by a big double window that looks
out toward the front yard and the road. 
On one occasion, while she was standing there looking out, she saw
Vaughn parked in his brother’s driveway looking at her through the blinds with
his binoculars.  At other times, he watched
them while they were outside.  The core
of the tort of invasion of privacy is the offense of prying into the private
domain of another.  Clayton v.
Richards, 47 S.W.3d 149, 153 (Tex. App.–Texarkana 2001, pet.
denied).  One cannot expect to be entitled
to seclusion when standing directly in front of a large window with the blinds
open or while outside.  Thus, the
evidence does not show intrusions into the Drennons’ seclusion or private
affairs.  The record does not support a
finding that the Vaughns are guilty of invasion of privacy.  See Valenzuela, 853 S.W.2d at
513.

Judgment

            There
is no evidence that the Vaughns committed intentional infliction of emotional
distress or invasion of privacy.  See Brewerton,
997 S.W.2d at 216; Valenzuela, 853 S.W.2d at 513.  These alleged causes of action cannot support
the judgment’s prohibitions against the Vaughns’ coming within seventy five
feet of the Drennons, disturbing the peace of the Drennons, communicating with
the Drennons, tampering with any prior communications with the Drennons, and
threatening or harassing the Drennons. 
Neither are these prohibitions supported by the nuisance cause of action
as it is properly addressed by other portions of the judgment.  Accordingly, we delete these prohibitions
from the judgment.  As there is no
evidence that Barbara Vaughn engaged in any wrongdoing, she cannot be held
liable for creating a nuisance or be required to pay actual damages.  Because the judgment against Barbara for
nuisance and actual damages is unsupported, the award against Barbara for
exemplary damages cannot stand.  See
Federal Express Corp. v. Dutschmann, 846 S.W.2d 282, 284 (Tex.
1993) (Recovery of punitive damages requires a finding of an independent tort
with accompanying actual damages.).  We
sustain the Vaughns’ third issue to the extent it asserts there is no evidence
of intentional infliction of emotional distress or invasion of privacy, their
fifth issue to the extent it asserts there is no evidence to support the
prohibitions regarding communications, and their seventh issue that asserts
there is no evidence of any cause of action by Barbara Vaughn.  We need not reach issue four.  See Tex.
R. App. P. 47.1.

 

Reasons for
Issuance

            In
their sixth issue, the Vaughns contend the injunction is void because it does
not set forth the reasons for its issuance. 
They rely on Rule of Civil Procedure 683, which states that every order
granting an injunction and every restraining order shall set forth the reasons
for its issuance.  

            Although
the rule does not specify, it has been held to apply only to temporary
restraining orders and temporary injunctions, not permanent injunctions.  Qaddura v. Indo-European Foods, Inc.,
141 S.W.3d 882, 892 (Tex. App.–Dallas 2004, pet.denied); Shields v. State,
27 S.W.3d 267, 273 (Tex. App.–Austin 2000, no pet.); Alexander Schroeder
Lumber Co. v. Corona, 288 S.W.2d 829, 835 (Tex. Civ. App.–Galveston
1956, writ ref’d n.r.e.).  The Vaughns
have appealed a judgment ordering a permanent injunction.  Therefore, the injunction is not void for
failure to set forth the reasons for its issuance.  We overrule the Vaughns’ sixth issue.

 

Exemplary
Damages

            In
their eighth issue, the Vaughns assert that the evidence of malice or gross
negligence is legally insufficient and cannot support the exemplary damages
award.  They argue that, while Millard
Vaughn intentionally created dams on his property knowing they would divert the
water, there was only speculation that his motive in doing so was to flood the
Drennons’ property.  They assert that a
reasonable fact finder could not form a firm conviction that Millard Vaughn had
a specific intent to cause substantial injury or harm to the Drennons.  Further, they argue that a reasonable fact
finder could not form a firm conviction or belief that Millard Vaughn’s actions
were objectively highly likely to result in great harm or that Millard Vaughn
proceeded with actual subjective awareness of such a risk.

Applicable Law

            Exemplary
damages may be recovered in an action for nuisance.  See Besso v. Southworth, 71
Tex. 765, 769, 10 S.W. 523, 524 (1888). 
Exemplary damages may be awarded only if the claimant proves by clear
and convincing evidence that the harm with respect to which the claimant seeks
recovery of exemplary damages results from fraud, malice, or gross negligence.  Tex.
Civ. Prac. & Rem. Code Ann. § 41.003(a) (Vernon Supp. 2005).  Clear and convincing evidence means the
measure or degree of proof that will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established.  Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2) (Vernon
Supp. 2005).  Malice means a specific
intent by the defendant to cause substantial injury or harm to the
claimant.  Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7).  Specific intent means that the actor desires
to cause the consequences of his act, or that he believes the consequences are
substantially certain to result from it. 
Reed Tool Co. v. Copelin, 689 S.W.2d 404, 406 (Tex.
1985).  Gross negligence means an act or
omission that, when viewed objectively from the standpoint of the actor at the
time of its occurrence, involves an extreme degree of risk, considering the
probability and magnitude of the potential harm to others and of which the
actor has actual, subjective awareness, but nevertheless proceeds with
conscious indifference to the rights, safety, or welfare of others.  Tex.
Civ. Prac. & Rem. Code Ann. § 41.001(11).  Gross negligence and malice may be proven by
direct or circumstantial evidence.  Transportation
Ins. Co. v. Moriel, 879 S.W.2d 10, 23 (Tex. 1994); Behee v.
Missouri Pac. Ry. Co., 71 Tex. 424, 429, 9 S.W. 449, 450 (Tex. 1888). 

            The
appellate court reviews all the evidence in the light most favorable to the
finding, taking into account contrary undisputed facts, to determine whether a
reasonable fact finder could have formed a firm belief or conviction regarding
malice or gross negligence.  Southwestern
Bell Tel. Co. v. Garza, 164 S.W.3d 607, 627 (Tex. 2004).  The reviewing court must assume that the fact
finder resolved disputed facts in favor of its finding if a reasonable fact
finder could and disregard all evidence that a reasonable fact finder could
have disbelieved or found to have been incredible.  Id.  Where findings of fact and conclusions of law
are not requested or filed, the judgment of the trial court must be affirmed if
it can be upheld on any legal theory supported by the evidence.  In re W.E.R., 669 S.W.2d 716,
717 (Tex. 1984).

Evidence

            The
Drennons have lived on this property since 1982.  They admitted that there had always been
drainage problems on their property but never to the extent they encountered in
the last part of 2004.  Prior to this
time, there had been ditches and pipes in place to carry away the excess
water.  In 1995, the year he bought his
land, Vaughn removed a pipe that drained water off the Drennons’ property onto
his.  In 1996, Vaughn first started
moving dirt, clearing land for the power right of way.  In the process, he removed trees and lowered
the ground behind the Drennons’ property. 
In 1996 or 1997, Vaughn dug a ditch on his property for the Drennons’
benefit, but it was not maintained. 
According to Mary, their friendship with the Vaughns had deteriorated by
June 2004.  On July 21, 2004, Vaughn
first piled dirt on the Drennons’ fence. 
In August 2004, Vaughn wanted the Drennons to remove trees on their
property and dig ditches along the north and south fence lines.  The Drennons refused.  Vaughn told Crocker that if there were not
going to be any ditches in the front, there would be no ditches in the
back.  

            In
August 2004, Vaughn did more dirt work behind the Drennons’ property.  During the fall, he started building dams and
kept adding more dirt.  In October, Vaughn
accused the Drennons of dumping sewage on his property although he was never
able to prove this claim.  Mary testified
that Vaughn watched when the water started flowing over their property in the
latter part of October.  He had built
four or five dams by the first of November. 
By December, the earthen dams had partially washed out.  In early December, after a heavy rain, Mary
saw Vaughn about twelve feet from the fence line, watching the water flow onto
the Drennons’ property.  On December 3,
2004, Vaughn placed the first of at least three timbers near the Drennons’
property, perpendicular to the boundary line, and added more dirt.  

            Crocker
thought Vaughn was trying to get the Drennons to do what he wanted, that is,
take out trees and put in a ditch in the front. 
Blackwell thought Vaughn graded and terraced his property to funnel
water onto the Drennons’ property. 
Vaughn told Blackwell that he was going to push a brush pile onto the
Drennons’ property because he likes to agitate people and he would like to see
all his neighbors move away.  Tatum
testified that he thought the purpose of the levies Vaughn built was to divert
water to the Drennons’ backyard.  Vaughn
told Tatum that he wanted the Drennons’ property.  

            Vaughn
testified that he watched the Drennon property because he was looking for
evidence that they were dumping sewage onto his property.  He said he tilled the dirt to dispose of the
sewage and big rains took the dirt away. 
He brought more soil in and that caused more water to drain onto the
McGee and Crocker properties.  When that
happened, they came to Vaughn and asked him to do something to alleviate that
problem.  So he used his tractor and “drug
backwards to where [he] could stop it temporary until [he] could fill it all
back in.”  He started putting dams in
because his property was eroding.  He put
the timbers behind the Drennons’ property, perpendicular to his boundary line,
because that was the only place that was eroding.  Vaughn said there was enough room for the
water to slow down around the timbers and travel down to a point where it would
not go onto the Drennons’ property.  When
he put the timbers in to hold the dirt, McGee and Crocker no longer had
problems.  

            Vaughn
received a letter from the Drennons’ lawyer in November informing him that his
actions adversely affected them.  Vaughn
said he never intended to leave the dams permanently.  He did not remove them because the
injunction, which was entered on December 7, prohibited him from removing
them.  He said he did not intend to put
dirt on the gate or to harass the Drennons. 
Vaughn admitted that his dams altered the flow of water.  Vaughn denied flooding anyone.  He said God flooded them.  He denied deliberately forcing the water to
go onto the Drennons’ property.  He admitted
that he put in the timbers after he received the letter from the Drennons’
attorney.

Discussion

            There
was testimony that Vaughn wanted his neighbors to move away, that he wanted the
Drennons’ property for himself, and that he was unhappy because the Drennons
would not put in drainage ditches in front of their house.  At the time Vaughn bought his property, there
were drainage ditches and pipes draining excess water from the Drennons’
property.  Vaughn removed a pipe, failed
to maintain the ditch at the back of the Drennons’ property, cleared and tilled
the land behind the Drennons’ property, and built four or five earthen dams
supported by timbers.  At that point, the
Drennons experienced damaging flooding they had never before experienced in the
three decades they had owned the property.

            Vaughn
had lived there for several years and was aware of the natural flow of water
and the drainage problems.  He kept watch
over the Drennon property and therefore knew how much water flowed into and
traveled through their yard.  After McGee
and Crocker complained about drainage from his property, he attempted to
correct the problem.  After he received
written notice from the Drennons, through their attorney, that his actions were
detrimental to them and they wanted him to stop, he reinforced the dams with
timbers and more dirt.  He did not
attempt to correct the problem affecting their land. Several witnesses
testified that these fortified dams forced water onto the Drennons’ property.

            Vaughn
denied any intent to harm the Drennons, explaining that he moved soil to clear
the power right of way, to stop erosion on his property, to till under sewage,
and to avoid causing excess drainage onto the McGee and Crocker
properties.  His reason for building the
dams is a disputed fact that the trial court could have reasonably resolved
against Vaughn.  See Garza,
164 S.W.3d at 627.  The trial court could
have found Vaughn’s testimony about his intent to have been incredible.  See City of Keller, 168 S.W.3d
at 822.  The record presents clear and
convincing evidence that could produce in the mind of the trier of fact a firm
belief or conviction that Vaughn desired to cause flooding by use of the dams
or that flooding was substantially certain to result supporting a finding of
malice.  See Copelin, 689
S.W.2d at 406.  

            Furthermore,
if Vaughn’s explanation is believed, he attempted to protect McGee and Crocker,
as well as his own property, at the Drennons’ expense.  The evidence is sufficient to show his acts
involved an extreme degree of risk of harm to the Drennons, of which Vaughn had
actual, subjective awareness, and yet he proceeded with conscious indifference
to their rights, safety, and welfare supporting a finding of gross
negligence.  See Boatman v. Lites,
970 S.W.2d 41, 46 (Tex. App.–Tyler 1998, no pet.) (Defendants, although
informed that their action in diverting surface water caused damage to
plaintiffs’ property, did not refrain from diverting water and were liable for
exemplary damages.); Bily v. Omni Equities, Inc., 731 S.W.2d 606,
614 (Tex. App.–Houston [14th Dist.] 1987, writ ref’d n.r.e.) (Defendant who was
aware his conduct blocked drainage and intentionally permitted impounding to
continue was liable for punitive damages.). 
The evidence is sufficient to produce in the mind of the trier of fact a
firm belief or conviction that the harm suffered by the Drennons resulted from
malice or gross negligence.  See Garza,
164 S.W.3d at 627.  We overrule the
Vaughns’ eighth issue.

Conclusion

            Because
there is no evidence to support any cause of action against Barbara Vaughn, we
reverse the injunctions and actual and punitive damage awards against her and
render a take nothing judgment as to Barbara Vaughn.  The injunctions from threatening or harassing
the Drennons, coming within seventy five feet of the Drennons at any time,
communicating with the Drennons in any manner, destroying, disposing of, or
altering any prior communication with the Drennons, and disturbing the peace of
the Drennons cannot be founded in any theory the Drennons pleaded or
proved.  We delete these injunctions from
the judgment.  The trial court did not
err by ordering Millard Vaughn to alter the slope of his property.  However, because the order does not clearly
describe the corrective measures Millard Vaughn is required to implement, we
reverse the trial court’s order requiring him to lower the elevation of his
land and remand the cause to give the trial court the opportunity to
clarify.  In all other respects, we
affirm the trial court’s judgment.

                                                                                                     SAM GRIFFITH    

                                                                                                               Justice

Opinion
delivered July 19, 2006.

Panel consisted of Worthen,
C.J. and Griffith, J.

(PUBLISH)