A. H. BUNCH v. MRS. M. E. THOMAS ET AL.

No. 6045.   Decided April 6, 1932.
(49 S. W., 2d Series, 421.)

*Grindstaff, Zellers & Hutcheson,* of Weatherford, for plaintiff in error.

*Preston Martin* and *Sam Shadle,* of Weatherford, for defendants in error.

MR. CHIEF JUSTICE CURETON delivered the opinion of the court.

We deem a detailed statement of this case unnecessary, since that of the Court of Civil Appeals is very comprehensive.

■ The judgment of the trial court granted a mandatory injunction in favor of Bunch, the plaintiff in error, requiring the destruction of a dam or levee on the land of Thomas, defendant in error. This judgment was reversed by the Court of Civil Appeals, and the case is before us by writ of error. 41 S. W. (2d) 361. The reversal was, in part at least, because of the insufficiency of the evidence to support the verdict. We must, therefore, permit the reversal to stand, as the question of the sufficiency of the evidence is not one within our jurisdiction. Electric Express & Baggage Co. v. Ablon, 110 Texas, 235, 218 S. W., 1030; Hall Music Co. v. Robertson, 117 Texas, 261, 1 S. W. (2d) 857. We deem it appropriate, however, to lay down what we conceive to be the principles of law applicable to this case as made by the facts.

The Court of Civil Appeals has appended to its opinion an elaborate statement of the evidence, which may be read in connection with this opinion. We will, therefore, but briefly state the facts.

Bunch owned a tract of land which lies generally north of and adjoining the Thomas tract. The slope of the Bunch land to the line of the Thomas land, for a distance of approximately 2,700 feet, is about one inch per 100 feet. Prior to any interference with the original lay of the land, the water falling on the Bunch tract flowed down gradually in a diffused state on to the Thomas land without damage. This appears from the testi-

mony of Mrs. Thomas, the defendant in error, who knew both tracts at a very early date, probably before the farms were put in cultivation. It is true that the Bunch land had a slope to some extent toward its center from three different directions, so that a kind of basin was formed therein, but prior to any artificial constructions being placed on the Bunch land it did not concentrate sufficiently to do any damage to Thomas' land,—in fact, there was never sufficient concentration of the surface waters to make a gully or rivulet on either the Thomas or the Bunch land until after it had passed Thomas' north line and through his land to a point more than 1,300 feet distant. We think that the evidence shows that prior to any artificial constructions on the Bunch land the surplus water which fell on the Thomas land passed off with the natural slope of the land in a southerly direction on to and over the Thomas land in a diffused state and without injury. Finally, at some remote time, prior to 1905, Mr. Hubbard, who then owned the Bunch land, cut ditches thereon, which concentrated the water and caused it to reach the Thomas land in this form, and in a manner which resulted in damages to Thomas' property. When this was done, Mr. Thomas, who was then living, built an embankment or levee, which prevented the water, after this change from its natural diffused state, from entering his field. He and Hubbard had a lawsuit about this structure, in which Thomas was the victor. It appears there was a public road about forty feet wide, running east and west, between the Bunch and Thomas farms. Just when the road was placed there the record does not clearly show. About 1918, however, the grade of this road was raised some two or three feet, with the result that a lake was formed or enlarged on the Bunch land. This road had ditches or barrow ditches running parallel with it, which concentrated the water about the middle of the Bunch field and immediately north of the line of the Thomas tract. The county then at the lowest place put in a concrete dip in such a way that the waters from the Bunch land and the ditches and barrow ditches of the road would pass over the road in a concentrated form to the Thomas land, to the injury of the latter. There is some conflict in the evidence as to whether or not Bunch, after he became the owner of the property, put in additional ditches, but the record clearly raises the issue that he did do so. Without referring to other evidence, we quote from the testimony of George Lassater, the rural mail carrier, as follows:

"I was rural mail carrier down in there from 1923 to 1926.

I know where the Bunch and Thomas farms are located, yes. They are on my route. I had occasion to pass along those roads and passed along that road running between the two farms. We had rains during that time, yes. I have observed water standing up there on the Bunch farm along the road, yes. I din't observe it much. I just carried the mail. At times the water would be backed up there 150 or 200 yards. I knew where there is a depression out in the Bunch farm from the road, yes. I observed it. There was such a lake up there, yes. I think the water would be deeper right next to the road than up in the field where it backed up. I have seen ditches or drains cut through the Bunch field down into the road. I saw those ditches but didn't see anyone cutting them, and don't know who cut them. The ditches would be leading from the north side of the road to the south side from the Bunch land to the Thomas land. The ditch across the road was full of water and I couldn't tell how deep it was, but I judge it was about two feet wide. I don't know who cut the ditches. It was full of water and I couldn't tell how deep it was. It appeared to be a freshly cut ditch and was right across the road. That was either in 1923 or in 1924. I delivered mail down there six days a week. The day before I saw this ditch the road was all right. I passed along the road the day before and did not cross that ditch; I knew I couldn't cross it; I knew I would stick my Ford, so I just backed up and went back to the post office and went around another road. Water was going through that ditch. The water was going through this ditch south onto the Thomas land."

See also the evidence of Lewis Thomas.

■ The record also shows that Bunch, while road overseer, built a bridge where the concrete dip had been previously placed. He built the bridge under the direction of the county commissioners. The mere fact, however, that he constructed the bridge under the direction of the county commissioners would not relieve him from liability for the tort, if it was a tort. 27 R. C. L., p. 1155, sec. 80. Mrs. Thomas, the defendant in error (Mr. Thomas having died in 1911), then built her levee or embankment on her own land higher and longer, to keep the water thus concentrated and thrown upon her from damaging her property. The result of the construction of this levee or embankment was to throw the water back on to the Bunch land. This lawsuit then followed:

The insistence in this case that Mrs. Thomas has no right

to maintain the levee constructed on her land is predicated upon Revised Statutes, art. 7589a, which in part provides:

"That it shall hereafter be unlawful for any person, firm or private corporation to divert the natural flow of the surface waters in this State or to permit a diversion thereof caused by him to continue after the passage of this Act or to impound such waters, or to permit the impounding thereof caused by him to continue after the passage of this Act, in such a manner as to damage the property of another, by the overflow of said water so diverted or impounded, and that in all such cases the injured party shall have remedies, both at law and in equity, including damages occasioned thereby," * * *

From the facts which we have thus briefly stated, and which appear quite fully in the opinion of the Court of Civil Appeals, it is plain that the surface waters, to prevent the flow of which the Thomas levee is maintained, are not waters which reach the line of Thomas' land in their natural diffused state, untouched by the hands of man. On the contrary, the undisputed evidence shows that they reach the line of Thomas' land at one point in a concentrated form, necessarily in a larger volume and in a manner entirely different from the condition which they would have been in had ditches not been cut on the Bunch land and the public road with its attendant ditches, barrow pits, culverts and bridge, not been constructed. It is the settled law of this State that while under the statute quoted the lower estate must receive the surface waters naturally flowing thereon from a higher estate, yet it is not required to receive these waters except in their natural condition, untouched by the hands of man. 27 Ruling Case Law, p. 1151, sec. 79; Farnham on Water Rights, vol. 3, secs. 886, 887, 891; Miller v. Letzerich, *post*, 49 S. W., 404, and authorities therein cited; Gulf, C. & S. F. Ry. Co. v. Helsley, 62 Texas, 593; Wilkerson v. Garrett, 229 S. W., 666 (writ refused); Higgins v. Spear, 118 Texas, 310, 15 S. W. (2d) 1010; Higgins v. Spear (Civ. App.), 283 S. W., 584; Kauffman v. Griesemer, 26 Pa., 407, 67 Am. Dec., 437; Wills v. Babb, 222 Ill., 95, 78 N. E., 42, 6 L. R. A. (N. S.), 136.

The rule is correctly stated in 27 Ruling Case Law, p. 1151, sec. 79, as follows:

"Under both the civil and the common law, water which naturally flows from higher to lower land may continue to do so without subjecting the upper owner to any liability therefor, but even in the jurisdictions where the civil law rule obtains, the servitude which the owner of the higher adjoining land has upon the lower land for the discharge of surface water naturally

flowing on the lower land from the dominant estate extends only to surface water arising from natural causes, such as rain and snow, and cannot be augmented or made more burdensome by the acts or industry of man, and it is the generally recognized rule both of the civil and the common law that a landowner cannot collect surface water into an artificial channel or volume, or precipitate it in greatly increased or unnatural quantities upon his neighbor, to the substantial injury of the latter. This is true although no more water is collected than would have naturally flowed upon the property in a diffused condition, for it is evident that, while a given piece of land may receive a large amount of surface water without injury thereto when it gently flows thereon from natural causes, yet when collected and discharged in considerable volume at a given point, it may become very destructive and injurious. Where the owner of higher lands constructs a ditch to drain the surface water therefrom, which increases the flow of water upon a lower proprietor, or which throws the water upon his land in a manner different from that in which it would have naturally flowed, to the latter's injury, it has been held that the former is liable for the injury thus occasioned, even though the ditch was constructed by him in the course of the ordinary use and improvement of his farm."

The case of Higgins v. Spear, 283 S. W., 584, is analogous to certain features of the instant case, and the principle there sustained is applicable. In that case the Court of Civil Appeals held that where an embankment erected by the defendants on their own land obstructed the flow of water which had been diverted from its natural course by the act of third persons, the defendants were not liable for damages due to impounding the diverted water and throwing it back or holding it on the plaintiff's land. In discussing the question, the Court of Civil Appeals in part said:

"Prior to the act of 1915 it was the established law in this state that one has no legal right to have surface water naturally flowing upon his land to pass thence to adjoining land; that the owner of the adjoining land, in the 'due exercise of dominion over his own soil,' may erect an embankment upon his land and thereby repel the surface water naturally flowing upon the adjoining land without incurring any liability to the owner of the adjoining tract for thus obstructing the flow of such surface water. Barnett v. Matagorda, etc., 98 Texas, 355, 83 S. W., 801, 107 Am. St. Rep., 636. The act cited changed this rule and made actionable the obstruction of the natural flow of sur-

face water the same as the obstruction of water flowing in a water course. It follows that in 1924 it makes no difference, so far as concerns the rights of the parties, whether the water, the flow of which was obstructed by defendants, be considered surface water or water flowing in a well-defined channel or water course.

"From the facts stated it is shown that the embankment erected by the defendants obstructed the flow of water which did not naturally flow across the land of plaintiffs and onto the defendants' land; that the water thus obstructed and impounded had been diverted from its natural flow by the acts of third persons upon land owned by them, and for whose acts neither of the parties to this suit are responsible.

"Land is subject to no servitude to receive upon it water, the natural flow of which has been diverted to it. The act of 1915 relates only to the 'natural flow.' It imposes upon land no servitude to receive water which did not naturally flow upon it.

\* \* \* \* \* \*

"Farnham on Waters, vol. III, p. 2576, par. 886, says:

" 'If one landowner by embankments and artificial erections of any kind on his own land causes surface water to flow onto his neighbor's land in a manner in which it would not but for such erection, the proprietor upon whose land the water is thrown may erect barriers against it.'

"And again, at pages 2579 and 2580:

" 'An upper owner, who, by artificial means, so drains his lands as to collect and discharge surface water in undue and unnatural quantities upon the land of a lower proprietor is not entitled to restrain the maintenance of a dam by the latter, in the exercise of his right to protect himself against such invasion of his premises.'

"Appellants say that the doctrine of the authorities cited applies only against those who divert the natural flow, and have no application against those who are not parties to the diversion. But, in our opinion, appellees' land is not burdened with any servitude to receive water not naturally flowing upon the same, so it matters not who diverted the water. Appellees, in the 'due exercise of dominion over their own soil' (Barnett v. Matagorda, etc., supra; Gannon v. Hargadon (Mass.), 10 Allen, 106, had the right to erect the embankment complained of to repel the water wrongfully diverted and thrown upon their land. If the building of the embankment by defendants damages the plaintiffs, it is *damnum absque injuria*. The ap-

pellants' remedy is against those who wrongfully diverted the water in the first instance.

\* \* \* \* \* \*

"We therefore conclude that appellees had the right to erect the embankment upon their land, and are not liable for any damage sustained by the appellants caused by water which had been diverted from its natural flow and by the embankment impounded and thrown back upon the appellees' land and the trial court properly so held."

This opinion of the Court of Civil Appeals and the holding made was approved by the Supreme Court in the same case. Higgins v. Spear, 118 Texas, 310.

Since the servient estate of Mrs. Thomas is charged only with receiving the flow of surface waters from the dominant heritage of Bunch while these waters reach the borders of the estate in their natural state, untouched by the hands of man, it necessarily follows that the statute involved affords no protection to Mr. Bunch, and that Mrs. Thomas has the right to maintain her embankment and levee for the purpose of keeping the surface waters from overflowing her land, so long as structures are maintained which cause these waters from the Bunch land to reach the borders of her estate in an unnatural form. We quite agree with the concluding portion of the opinion of the Court of Civil Appeals, wherein that court states:

"We do not think, however, that that article can be held to be operative so as to prohibit the appellants from so maintaining their dam or embankment as to protect their own lands from floods and accumulated waters arising from and caused by acts or constructions by other persons. In other words, we think the appellants were not only entitled to maintain the dam in question in its original height, breadth, and length, but also had the right to increase those dimensions so far as was reasonably necessary to protect their own lands from accumulated waters caused by acts and constructions of others."

We do not deem it necessary to discuss the other questions discussed by the Court of Civil Appeals, and therefore do not pass upon them. The Court of Civil Appeals, however, reversed the case because, in its opinion, "the evidence fails to support the verdict and judgment below in essential particulars."

We accordingly affirm the judgment of the Court of Civil Appeals reversing the case. The trial court, however, will, upon a similar state of facts, be guided by this opinion of the Supreme Court.