**TEXAS WOMAN'S UNIVERSITY,**
Appellant,

v.

**THE METHODIST HOSPITAL,**
Appellee.

No. 01–05–01078–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Aug. 17, 2006.

James K. LaRoe, III and Paula J. Walsh, The Law Offices of James K. La-Roe, P.C., Dallas, TX, Roger Townsend and Jennifer R. Tillison, Alexander, Dubose Jones & Townsend LLP, Houston, TX, for appellant.

Christopher Mohr Odell, Michael K. Swan, Ann M.H. Stephens and Murry B. Cohen, Akin Gump Strauss Hauer & Feld, L.L.P., Houston, TX, for appellee.

Panel consists of Justices JENNINGS, HANKS, and HIGLEY.

## OPINION

TERRY JENNINGS, Justice.

Appellant, Texas Woman's University ("TWU"), challenges the trial court's rendition of summary judgment in favor of appellee, The Methodist Hospital ("Methodist"), in TWU's suit against Methodist for violation of the Texas Water Code,[1] negligence, nuisance, and trespass arising out of TWU's damages incurred during Tropical Storm Allison in June 2001. In four issues, TWU contends that the trial court erred in granting Methodist's summary judgment motion (1) on TWU's Texas Water Code claim because TWU raised a fact issue "that its damages were caused by surface waters that had been diverted by Methodist"; (2) on TWU's negligence claim because TWU "presented legally sufficient evidence to raise a duty under section 11.086 of the [Texas] Water Code, an undertaking theory, federal regulations, and general common-law principles"; (3) on TWU's nuisance claim because TWU "raised a fact issue that Methodist had negligently and abnormally invaded its property interests"; and (4) on TWU's trespass claim because TWU "proved Methodist knew with practical certainty that its conduct would cause the water on its premises to invade TWU's property."

We affirm in part and reverse and remand in part.

## Factual and Procedural Background

In its first amended petition, TWU asserted that on June 9, 2001, TWU was connected to Methodist by an underground tunnel system and that prior to June 9, 2001, TWU and Methodist attended "tunnel dwellers" meetings sponsored by the Texas Medical Center ("TMC") for the purpose of planning and implementing a joint response to potential flooding by all institutions connected to the underground tunnel system. TWU also asserted that the TMC installed and utilized a monitoring and warning system to alert TMC institutions to potential flooding and Methodist agreed to respond to these warnings by "protecting their surface perimeter from water intrusion" and "instituting their flood protection procedures" when the "Harris Gully box culverts reached seven feet at the point where they flowed into Braes Bayou." TWU further asserted that Methodist owned "flood logs ... to block the entry of water into [Methodist] in the event that rain run-off water levels rose in front of the driveways and other entrances to [Methodist]."

TWU alleged that on June 9, 2001, Methodist "diverted and/or impounded" surface water into Methodist "from the

1. *See* TEX. WATER CODE ANN. § 11.086 (Vernon 2000).

entrances to [Methodist's] Neurosensory Center underground parking garage and [ ] loading dock" and then "allowed and/or caused the [ ][w]ater to flow from [Methodist] into the [t]unnel and, ultimately, into the TWU Campus." TWU further alleged that Methodist "had notice of the potential for high surface run-off water," that Methodist ignored the TMC's warnings concerning high water and failed to install flood logs at its entrances, and that, as a result, "surface run-off rain water entered [Methodist] . . ., was allowed to exit Methodist, traveled and overflowed the [t]unnel, and overflowed and flooded the TWU Campus."

Methodist filed a summary judgment motion and a supplemental summary judgment motion. In its original motion, Methodist contended that there is no duty for one property owner to protect another property owner from flooding and that Methodist, in fact, "flooded from overland flow of water from the Harris Gully and/or the Braes Bayou." Methodist asserted that the tunnel referred to in TWU's petition had been sealed for more than a decade, that the wall held during the storm, and that the tunnel ran through third party institutions unrelated to Methodist before entering TWU.

Methodist argued that it was entitled to summary judgment on TWU's negligence claim because instituting flood protection measures before the storm did not create any duties to TWU. Methodist attached to its motion the affidavit testimony of Kevin Edwards, Methodist's senior project coordinator, who testified that Methodist instituted flood protection measures "solely for the protection and benefit" of Methodist. Methodist also cited deposition testimony of Bill Bussman, TWU's custodial maintenance supervisor, who agreed that it was TWU's obligation "to look out for its own campus." Methodist asserted that

Bussman disclaimed any reliance by TWU on Methodist for flood protection. Methodist also contended that TWU's flooding was not foreseeable, citing Edwards's testimony that the tunnel between TWU and Methodist had been sealed and Bussman's testimony that he did not think that Methodist "would flood by the direction of the Favrot Methodist tunnel," although he stated that he "knew it was possible."

Methodist argued that TWU's nuisance and trespass claims should be dismissed because TWU presented no evidence of a negligent invasion of a property interest and no evidence that Methodist's actions were intentional.

In its response, TWU asserted that undisputed summary judgment evidence showed that Methodist owed a duty of ordinary care to TWU. TWU attached to its response an affidavit from Bussman, who testified:

Before June 8, 2001, I attended [TMC] Tunnel Dwellers meetings that included representatives of [Methodist]. At these meetings, the attending institutions, including [Methodist], agreed that in order to keep from flooding each other through the underground tunnels and passageways, each institution had to first protect its perimeter from runoff water from the streets entering the buildings. As such, TWU was depending upon [Methodist] to use its flood logs, sandbags, and flood prevention procedures to prevent the tunnels and TWU from flooding through the tunnel connecting [Methodist] to TWU through [the] Favrot Hall basement. It was absolutely foreseeable that if [Methodist] did not protect its perimeter TWU would be flooded through the tunnel. At the [TMC] Tunnel Dwellers meetings, each institution, including [Methodist], agreed to protect the other connected institutions, including TWU, by first

protecting that institution's own perimeter.

On the morning of June 9, 2001, I was an eyewitness to TWU's flooding. TWU's perimeter was not breached at the surface level.... Rather, TWU flooded from water coming through the tunnel from [Methodist]. I also witnessed water flowing from the streets directly into [Methodist] at various locations and that [Methodist] had not used its flood logs or sandbags at those locations.

In my deposition, I was asked whether I thought that TWU would flood from the tunnel on June 8–9, 2001. My response was no, and that response is true today. The reason that I did not think that TWU would flood through the tunnel was because after all the flood preparations by the institutions in the [TMC], including the [TMC] Tunnel Dwellers meetings, it was unthinkable that [Methodist] would fail to protect its perimeter, especially since all the [TMC] institutions had warnings and notices of the impending flood probability. It was a certainty that if [Methodist] did not protect its perimeter, TWU would flood through the tunnel. [Methodist's] total failure to act was shocking to me because at the [TMC] Tunnel Dwellers meetings, [Methodist] employees had strongly represented that they were prepared and vigilant in heavy rain situations and had agreed to protect their perimeter, and thereby protect TWU.... Based upon [Methodist's] representations, TWU relied on [Methodist] to protect TWU and the tunnels.

... [B]ased upon the agreements and representations at the [TMC] Tunnel Dwellers meetings, each institution was also necessarily protecting the other institutions connected by tunnels from flooding. This mutual protection was the sole purpose of these meetings. Each institution necessarily had to rely on the other institutions' efforts to protect the collective perimeter....

Attached to Bussman's affidavit was a copy of a document titled "Tunnel Flood Control," with an "original date" of August 13, 2001 and a date stamp of December 20, 2001, signed by the TMC and its member institutions, including Methodist. Bussman stated that this policy reflected "the formal written documentation of the agreement of the [TMC] Tunnel Dwellers institutions, including [Methodist] and TWU, to protect each other before June 8, 2001." All parties agreed that this document was not signed by the member institutions until after the storm.

TWU also attached to its response an affidavit from Michael Labroski, Methodist's project coordinator during the storm, whose responsibilities included "coordinating flood protection planning and procedures" for Methodist. Labroski testified:

Before June 8 and 9, 2001 ... I, on behalf of [Methodist], had attended numerous [TMC] Tunnel Dwellers Group meetings.... At those meetings, the institutions in the [TMC] connected by underground tunnels met and discussed ... the potential for flooding from surface water in the streets around the [TMC] into and through the perimeters of the institutions and then into the tunnel system, the flood protection efforts ..., [and] the agreed triggers ... that the institutions would all use to begin implementing their protection procedures against flooding.... Jay Atkins, Acting Director of The Methodist Hospital Facilities Management Services, also attended these meetings.... Jay's job ... was to make sure that [Methodist] was ready and prepared to protect [Methodist's] buildings against flooding.... I was an authorized employee

and representative of [Methodist] at those meetings and attended on behalf of [Methodist].

Before June 8 and 9, 2001, and based on the [TMC] Tunnel Dwellers Group meetings, [Methodist's] own knowledge, experience, and investigation of flood potential and prevention, and findings of engineers for [Methodist] and [TMC] Tunnel Dwellers Group, [Methodist]:

(1) Agreed to immediately begin its ground level flood protection devices when the Harris County Box Culvert reached 7 feet;

(2) Knew that if [Methodist] did not protect its ground level perimeter from surface water, it would flood other institutions connected by the tunnel system including [TWU];

(3) Agreed with the other institutions in the [TMC] Tunnel Dwellers Group to protect each other from flooding through the tunnel system by properly protecting their surface level perimeters and the tunnel system from surface water runoff from the streets;

(4) Knew that [Methodist] needed 25–30 people to erect its existing ground level perimeter flood logs and sand bags and that it took approximately 2 hours to complete the installation;

(5) Knew that [Methodist] was the lowest point in the [TMC] and that the entrance and exit to [Methodist's] Neurosensory Building parking garage were the lowest points on the [Methodist] surface level perimeter;

. . . .

I talked to [Methodist] employees and made observations to determine what happened on June 8 and June 9, 2001. . . . I determined that the following actions took place:

(1) [TMC] gave [Methodist] warnings of the heights of the Harris Gully Box Culvert;

(2) The heights of the Harris Gully Box Culvert were shown on the internet throughout the night of June 8–9, 2001;

(3) Neither the Administrator on call at [Methodist] (the person who was responsible for implementing the flood protection response) nor anyone else on the evening of June 8–9 2001 responded to the [TMC's] warnings/notices or to [Methodist's] own flood observations until after midnight;

(4) [Methodist] did not follow its own procedures and as a result not enough people were present and not enough time was available to install any of [Methodist's] flood logs or sand bags;

(5) Surface water from the streets entered [Methodist] buildings through various locations where the flood logs and sand bags should have been installed to control and block the water. After the water entered [Methodist], it funneled down to levels B–1 and B–2 through the Favrot Dock, into Favrot Hall, through the tunnel and into [TWU];

(6) The water entered [Methodist] through various locations, including the garage entrance and exit ramps to [Methodist's] Neurosensory Building parking garage. Flood logs were present and available to have been installed, yet [Methodist] did not install its flood logs.

. . . .

After the June 8 and 9, 2001 flood, the [TMC] Tunnel Dwellers Group wrote down what we called the [TMC] Management Group Procedures. These pro-

cedures set forth in writing what each of the member institutions had agreed to before the June 2001 flood. I helped draft these procedures. The written procedures included the agreement ... that [Methodist] and other member institutions would immediately begin direct flood control measures to protect the ground level perimeter ... and the tunnel system when the Harris Gully Box Culvert reached 7 feet. Even though on June 8 and 9, 2001 the Harris Gully Box Culvert reached 7 feet, [Methodist] did not take its required flood control measures.

TWU also attached to its response minutes from the tunnel dwellers meetings[2] and a time line of events on June 8–9, 2001, reflecting notices by the TMC to member institutions regarding street flooding in the medical center. In addition to the deposition testimony of Bussman and Edwards, TWU also attached the deposition testimony of Keith Weaver, TMC's maintenance director, who stated that he witnessed water flowing from Methodist into an underground tunnel and water flowing from the street into Methodist's neurosensory building's parking garage, across the bottom of the Favrot dock.

Methodist then filed its supplemental summary judgment motion, arguing that because the "waters that damaged Methodist ... were 'floodwaters' reserved to the exclusive control of the [S]tate of Texas," Methodist could not be held liable for any resulting damages. Methodist attached to its motion the deposition testimony of Larry Mays, TWU's expert, Mays's "draft report," and an affidavit of Phillip Bedient, Methodist's expert. Methodist asserted that Mays's testimony conclusively established that the waters that flowed from Methodist to TWU were "floodwaters." Methodist cited Mays's deposition that the storm sewer network was designed for "a two and three year return period," that the network would fill up very quickly, even in minor storms, resulting in "pretty large flows in the streets," that the storm delivered rainfall in a volume associated with a one-hundred-year storm, and that the system was "just not big enough to handle the flows." Methodist also cited Mays's testimony that the TMC was "prone to flooding," that there is "a tremendous amount of overland flow that comes down and street floods," and that Braes Bayou flooded parts of the TMC. Methodist also cited Bedient's affidavit, wherein he testified:

[T]he [TMC] is located at the confluence of the Harris Gully, a natural watercourse that has been converted to an underground culvert system, and Braes Bayou. Harris Gully has a defined bank and bed, a current of water, and a permanent source of supply. Prior to its conversion to an underground culvert, Harris Gully was a naturally-occurring stream that served as the principal draining mechanism for a sub-watershed of the Braes Bayou, to which Harris Gully is a tributary. Included within the sub-watershed drained by Harris Gully are the [TMC], [and] Rice University, ...

On the night of June 8–9, 2001, ... violent storm cells moved into the area of the Harris Gully watershed and, beginning at approximately midnight, began to rain very heavily. The rainfall

---

2. TWU cites the following statement allegedly made by Labroski contained in the minutes of one of the tunnel dwellers meetings: "If something is not done at the top of the ramp off of Wilkins[,] Favrot Tower and our new mechanical room will flood. If water gets down in the B/1 level it could hurt you Bill, through the wall." TWU asserts that the reference in this quote refers to Bill Bussman of TWU.

received at Rice University over the next three hours constitutes some of the heaviest ever recorded.... The intensity of the rainfall exceeded that which would be associated with a 500–year storm.

The rate and volume of rainfall quickly overwhelmed the storm sewer system in the area, which is intended to funnel rainwater into Harris Gully. As the storm sewers filled up, the water backed into the streets and began to flow toward the Braes Bayou. At the same time, the level of water in Braes Bayou began to exceed the height of the box culvert where Harris Gully discharges its water. As a result, Harris Gully became unable to discharge properly, and the water in the Gully began to surcharge, or back up, under pressure. This water pushed its way out of the storm sewer system and into the streets in the [TMC]. One example of this "surcharge" effect is the eyewitness reports of manhole covers that were blown off by pressurized water.

... The [TMC] became overwhelmed by floodwater rushing into the basin from multiple sources, including surcharge water from Harris Gully; overland flows of water unable to drain into the Gully; and local rainfall. These floodwaters moved through the streets of the [TMC] in great volumes and at high speed.

In its response to Methodist's supplemental motion, TWU asserted that the water was not "floodwaters" and that section 11.086 of the Texas Water Code provided another basis for Methodist's duty to TWU. TWU attached to its response Mays's affidavit, wherein he testified:

... [T]he water that flooded the TWU campus through the tunnel was rain run off "surface water" that [Methodist] had allowed into its below street level entrances to its garage and loading dock by failing to use any of its flood logs and that [Methodist] diverted directly into its basement B–1 level tunnel and into the tunnel system connecting [Methodist] to TWU, Favrot Hall....

. . . .

No rivers, streams, beds, banks, ponds, bayous, culverts or pipes overflowed to flood either [Methodist] or TWU's campus....

The water that [Methodist] allowed to pour down from the streets and the surrounding land into [Methodist's] underground parking garage entrance and exit and loading dock had never been under the control of a river, stream, ditch, tank, pond, bank, pipe, bed or channel before [Methodist] allowed it to enter [Methodist's] underground garage. It had not been under the control of a watercourse defined by a bed or bank or current before it entered [Methodist]. It was simply rain water running off and moving by gravity toward the only surface level watercourse in the area, the Braes Bayou. This water ... had never even made it into a storm sewer ... [and] was not back water from water overflowing from or out of a watercourse.

. . . .

The rain run off surface water ... naturally flowed overland towards [Methodist] as part of the watershed not as part of any watercourse but as surface water moving toward the Braes Bayou.

Mays also testified that Bedient's affidavit was misleading. Specifically, Mays testified:

Dr. Bedient ... uses the term "Harris Gully watershed" and refers to the Harris Gully as if it were a watercourse above ground at [Methodist]. A "watershed" is a topographical designation to

describe an area in which surface water flows during a rain event because of gravity toward a "watercourse" such as a river, bayou, ditch or creek. Every parcel of land on planet Earth is part of some watershed but is not necessarily part of a "watercourse."

. . . .

. . . [T]he water that [Methodist] allowed to enter its hospital and that flooded TWU's campus was not water that overflowed the underground Harris Gully box culverts or backwater created by them being full. . . .

. . . .

Dr. Bedient fails to address either timing of his opinions or to address the specifics of the water that entered [Methodist] and flooded TWU through the tunnel. During Tropical Storm Allison the large rainfall in the upper portion of the Harris Gully watershed became overland flow across the land including the streets. Water surface elevations in these streets exceeded the elevations of the exterior entrance locations to [Methodist] and because [Methodist] failed to implement their flood protection procedures, they caused the flooding of [TWU]. These overland flows were never under the control of a natural watercourse having a bank and bed, a current of water and a permanent source of supply.

A surcharge or backwater effect was not happening and the Harris Gully underground culverts were not clogged when water was flooding into TWU's campus through the tunnel system. Water first entered [Methodist] before or around midnight . . . before the Harris Gully culverts were filled at the downstream end, indicating that the Harris Gully culvert was not under pressurized conditions when water first entered [Methodist].

. . . .

The fact that the water that flooded [Methodist] diverted into TWU's campus was not surcharged or back water backed up from the underground Harris Gully box culverts is further shown by the sheer volumes of the water that [Methodist] flooded into its hospital and the basements of the other institutions. . . .

. . . .

. . . [O]verland flow is "flow of water across the land surface in a down gradient direction. . . ." Other definitions define overland flow as "water flowing over the ground surface toward a stream, channel, or water body". . . . Overland flow is also sometimes called sheet flow, urban sheet flow, diffused surface water. . . .

The trial court granted Methodist's supplemental summary judgment motion, and dismissed all of TWU's claims with prejudice.

## Standard of Review

To prevail on a rule 166a(c) summary judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and that there is no genuine issue of material fact. Tex.R. Civ. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995); *Farah v. Mafrige & Kormanik, P.C.*, 927 S.W.2d 663, 670 (Tex.App.-Houston [1st Dist.] 1996, no writ). We may affirm a summary judgment only when the record shows that a movant has disproved at least one element of each of the plaintiff's claims or has established all of the elements of an affirmative defense as to each claim. *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997); *Farah*, 927 S.W.2d at 670. In deciding whether there is a disputed material fact issue precluding summary judgment, proof favorable to

the non-movant is taken as true, and the court must indulge every reasonable inference and resolve any doubts in favor of the non-movant. *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995); *Lawson v. B Four Corp.*, 888 S.W.2d 31, 33–34 (Tex.App.-Houston [1st Dist.] 1994, writ denied).

## Water Code Violation

In its first issue, TWU argues that the trial court erred in granting Methodist's summary judgment motion on TWU's claim under section 11.086 of the Texas Water Code because TWU raised a fact issue "that its damages were caused by surface waters that had been diverted by Methodist." TWU notes that Bedient, Methodist's own expert, testified that the TMC flooded as a result of floodwaters, overland flow, and local rainfall, and that Mays, TWU's expert, provided substantial expert testimony that TWU incurred damages resulting from the overflow of surface water diverted by Methodist.[3]

Methodist argues that section 11.086 does not apply because it prohibits only the diversion of "diffused surface waters," as that term has been defined by Texas courts, and that the waters that flooded Methodist and TWU were not diffused surface waters because they were diverted artificially by the TMC's streets and drainage system. Thus, the primary dispute between the parties concerns the proper characterization of the waters that flooded TWU, and whether such waters give rise to an actionable claim under section 11.086.

■ Section 11.086, "Overflow caused by Diversion of Water," provides:

(a) No person may divert or impound the natural flow of surface waters in this state, or permit a diversion or impounding by him to continue, in a manner that damages the property of another by the overflow of the water diverted or impounded.

(b) A person whose property is injured by an overflow of water caused by an unlawful diversion or impounding has remedies at law and in equity and may recover damages occasioned by the overflow.

TEX. WATER CODE ANN. § 11.086(a)—(b) (Vernon 2000). Damages are allowed under section 11.086 when "(1) a diversion or impoundment of surface water, (2) causes, (3) damage to the property of the plaintiff landowner." *Dietrich v. Goodman*, 123 S.W.3d 413, 417 (Tex.App.-Houston [14th Dist.] 2003, no pet.). The term surface water, as used in section 11.086, is not defined in the Water Code, but has been interpreted by Texas courts to mean water "which is diffused over the ground from falling rains or melting snows, and [it] continues to be such until it reaches some bed or channel in which water is accustomed to flow."[4] *Id.; Dalon v. City of*

3. Additionally, citing *Valley Forge Ins. Co. v. Hicks Thomas Lienstern, L.L.P.*, 174 S.W.3d 254, 258–59 (Tex.App.-Houston [1st Dist.] 2004, pet. denied), TWU asserts that this Court has held that flooding caused by Tropical Storm Allison could be attributed to both flood and surface water. In *Valley Forge Ins. Co.*, this Court noted that "Tropical Storm Allison deluged the area with rain, creating a large amount of surface water and causing Buffalo Bayou to overflow its banks." *Id.* at 259. In addressing an insurance coverage dispute between a law firm located in a flood-

ed office building, we stated that "[t]he law firm's loss was caused by a combination of flood and surface water," and we held, based on the specific provisions of the firm's insurance policy, that the loss was excluded under the policy. *Id.* We did not address section 11.086 or the distinction between surface waters and floodwaters.

4. The majority in *Dietrich* stated, "unless or until the legislature amends the statute, we reluctantly hold that the term "surface water," as used in section 11.086 of the Water

*DeSoto*, 852 S.W.2d 530, 538–39 (Tex.App.-Dallas 1992, writ denied); *see also Raburn v. KJI Bluechip Invs.*, 50 S.W.3d 699, 704 (Tex.App.-Fort Worth 2001, no pet.) (defining surface water as "water or natural precipitation diffused over the surface of the ground until it either evaporates, is absorbed by the land, or reaches a bed or channel in which it is accustomed to flowing."). Texas courts have further held that surface water is never found in a natural watercourse having "(1) a bank and bed, (2) a current of water, and (3) a permanent source of supply." *Dietrich*, 123 S.W.3d at 418 (citing *Hoefs v. Short*, 114 Tex. 501, 273 S.W. 785, 787 (1925)). "Although the source [of a watercourse] must be permanent, such as a watershed, it need not be continuous, and a watercourse may be dry for long periods of time." *Id.*

Additionally, "[t]he chief characteristic of 'surface water' is that it does not follow a defined course or channel and does not gather into or form a natural body of water." *Id.* at 419; *see also Dalon*, 852 S.W.2d at 538. "When rainfall is under control, either by ditches, tanks, ponds, or pipes, it is no longer considered surface water." *Dalon*, 852 S.W.2d at 538–39 (noting that creek in which water flowed was natural waterway, and that once rainfall entered creek, it was no longer surface water). Another "chief characteristic of surface water is its inability to

maintain its identity and existence as a body of water, distinguishing it from water flowing in a natural watercourse." *Id.* at 539.

In contrast, "[f]loodwaters are those which, generally speaking, have overflowed a river, stream or natural water course and have formed a continuous body with the water flowing in the ordinary channel." *Valley Forge Ins. Co.*, 174 S.W.3d at 258 (quoting *Sun Underwriters Ins. Co. v. Bunkley*, 233 S.W.2d 153, 155 (Tex.Civ.App.-Fort Worth 1950, writ ref'd)); *see also Raburn*, 50 S.W.3d at 704 ("Flood waters are waters above the regular flow of a stream"); *Dalon*, 852 S.W.2d at 538 ("If the floodwater forms a continuous body with the water flowing in the ordinary channel, or if it temporarily overflows presently to return, as by recession of the waters, it is to be regarded as still a part of the stream.") (quoting 78 Am.Jur.2d Water § 225 at 670 (1975)).

The determination of whether the waters that flooded TWU are surface waters or floodwaters is important because, as both parties agree, the State has the ownership of and the non-delegable duty to control floodwaters and to maintain the appurtenant instrumentalities used for flood control, and Methodist would not be liable if TWU was flooded by floodwaters. *See Raburn*, 50 S.W.3d at 704 (citing Tex. Const. art. XVI, § 59) ("The conservation and development of all of the natural re-

---

Code, means diffused surface water." *Dietrich v. Goodman*, 123 S.W.3d 413, 419 (Tex. App.-Houston [14th Dist.] 2003, no pet.). Before making this holding, the court characterized the failure to define the term surface water in the Water Code as a "legislative oversight," creating problems compounded by the fact that the term is used in different contexts. *Id.* at 417. For example, the court noted that, "[i]n common usage, the term simply means 'natural water that has not penetrated much below the surface of the ground,'" *Id.* (citing Webster's Third New

International Dictionary 2300 (1993)). However, in the context of riparian rights, "surface water" is a term of art used to refer to diffused surface water. *Id.* at 418 (citing Black's Law Dictionary 1585 (7th ed.1999)). The court further noted that, initially, Texas courts interpreting former enactments of section 11.086 did not appear to be "particularly concerned with the character of the water being diverted," but that approximately seventy years ago, courts began using the riparian definition of surface water in their construction of the statute. *Id.* at 418.

sources of this State, ... including the control, storing, preservation and distribution of its storm and flood waters, ... are each and all hereby declared public rights and duties.").

Here, it is undisputed that the storm dumped a significant amount of rainfall on the TMC and that, at the moment the rain was falling from the sky into the areas of the TMC, the rain was properly characterized as surface water. However, the parties presented conflicting evidence on whether the water that flooded Methodist, and eventually TWU, transformed from diffused surface waters, which all agree would be actionable under section 11.086 and general negligence theories, into floodwaters, which would not. For example, Mays testified in his deposition that Methodist began to flood before Harris Gully[5] filled and that water was coming into Methodist due to "street flooding." Mays further stated that water from the streets entered Methodist at five locations and that if Methodist had properly and timely installed its flood barriers, TWU would not have flooded. More significantly, in his affidavit, Mays testified that TWU was flooded through the tunnel by "rain run off" that Methodist allowed into its below street level entrances by failing to use its flood logs.[6] Mays maintained that "[n]o rivers, streams, beds, banks, ponds, bayous, culverts or pipes overflowed to flood" the two institutions and that the water that poured into Methodist's underground parking garage entrance and exit and loading dock from the streets and land surrounding Methodist was never "under the control of a river, stream, ditch, tank, pond, bank, pipe, bed, or channel." Rather, Mays stated, the water "was simply rain water running off and moving by gravity toward the only surface level watercourse in the area" and that the "rain run off surface water ... naturally flowed overland towards [Methodist] as part of the watershed." Opinions from our sister courts suggest that a watershed itself does not constitute a watercourse, and this conclusion is consistent with Mays's testimony that any piece of land could be characterized as a watershed. Otherwise, as soon as rain hit "any piece of land," the rain would automatically lose its classification of diffused surface water, and section 11.086 would be rendered meaningless.

Mays also specifically disputed some of Bedient's opinions regarding the source of Methodist's and TWU's flooding. For example, Mays noted that some of Bedient's opinions relied upon by Methodist in its summary judgment motions related in a more general fashion to the flooding of the entire TMC area and did not address the actual flooding sources or timing at issue in this case.

▆ As to Methodist's alleged diversion or impoundment of surface water, Mays testified that water entered Methodist from multiple entrances and that Methodist allowed water to pour into its below-street-level entrances to its garage and loading dock by failing to use any of its flood logs. He stated that Methodist diverted this water into its basement tunnel and into the tunnel system connecting to TWU, and that TWU would not have

---

**5.** The parties agree that Braes Bayou is a watercourse, but dispute whether Harris Gully and the streets in the TMC themselves can be characterized as watercourses.

**6.** Methodist asserts that Mays's affidavit contains unsubstantiated factual and legal conclusions. We disagree. In fact, Mays's testimony is based on much of the same data and information relied upon by Bedient, Methodist's expert, as well as a review of the deposition testimony in this case. It appears that Mays and Bedient simply have differing expert opinions as to how and why Methodist and TWU flooded.

flooded but for Methodist's diversion or impoundment of this water. Labroski, Methodist's project coordinator, testified that "[s]urface water from the streets entered [Methodist] buildings through various locations where the flood logs and sand bags should have been installed to control and block the water," that "[a]fter the water entered [Methodist], it funneled down to levels B–1 and B–2, through the Favrot Dock, into Favrot Hall, through the tunnel and into [TWU]," and that "[t]he water entered [Methodist] through various locations, including the garage entrance and exit ramps to [Methodist's] Neurosensory Building parking garage." In regard to the elements of diversion or impoundment, the parties refer us to *Burbridge v. Rich Props., Inc.*, 365 S.W.2d 657 (Tex.Civ. App.-Houston [1st Dist.] 1963, no writ). In *Burbridge*, decided under the predecessor statute to section 11.086, the owner of a building sued the owners of an adjoining building for permitting water to be impounded in the adjoining building, which then flowed or seeped into the plaintiff's building. *Id.* at 658. The court quoted the "generally accepted view that a landowner has no natural right, by means of any building or other structure placed on his land, to discharge on adjoining premises the water which may accumulate from … natural causes." *Id.* at 660. The jury found that substantial quantities of water entered the plaintiff's building from the adjoining building, and the court held, based on the undisputed evidence that water was permitted to accumulate in the adjoining building, that the plaintiff building owner was entitled to damages. *Id.* at 661. Similarly, here, an examination of the voluminous summary judgment record reveals that there is at least some evidence that Methodist diverted or impounded surface water through its low level entrances and exits and into tunnels, basements, and loading docks and, ultimately, into TWU.

We hold that TWU raised a fact issue as to whether Methodist diverted or impounded surface waters through tunnels and passageways to TWU in violation of section 11.086 of the Texas Water Code. Accordingly, we further hold that the trial court erred in granting Methodist summary judgment on TWU's section 11.086 claim.

Methodist would have been entitled to summary judgment if the undisputed evidence showed that TWU was flooded exclusively due to a back water effect or surcharge from Braes Bayou, which both parties agree constitutes a natural watercourse. Such waters would be properly considered floodwaters and subject to the exclusive control of the State. *See Bunkley*, 233 S.W.2d at 156 (noting that it was "undisputed that the water was not backed up from a river, creek or other natural watercourse" and holding that water could not be regarded as floodwaters). TWU even concedes that, under the law, at least as it has been interpreted by our sister courts, it would have no actionable claim against Methodist under section 11.086 if Methodist had diverted water surcharged from Braes Bayou. However, the evidence presented failed to establish, as a matter of law, whether Methodist and TWU were flooded as a result of (1) a surcharge or "back water effect" from Braes Bayou, (2) a storm sewer network that was either completely full, unable to accept any more water, or that was simply inadequate, unable to drain water being channeled into the system fast enough into Harris Gully, causing the water to back into the streets and flood the TMC, or (3) simply, a volume of rain that rapidly filled the streets of the TMC and the surrounding watershed, causing the level of the accumulated rain water to rise quickly to the point that it poured into the unprotected lower level entrances and exits of Methodist. We recognize that, to some extent,

there may be a fine line between the above three possibilities, especially the latter two, and that there may be other possible causes for the flooding of Methodist and TWU. However, this is precisely the reason why, at this stage of the litigation, judgment as a matter of law on this issue is not appropriate.

■ Methodist also urges that it cannot be liable under section 11.086 because diffused surface waters are those that have been "untouched by the hands of man." Methodist reasons that once diffused surface water becomes concentrated or channeled by manmade changes to the natural formation of the land, the water, although technically still surface water, is no longer diffused surface water and is instead floodwater under the exclusive control of the State. Methodist asserts that "it would be difficult to imagine a more artificial environment than the TMC." Methodist cites Mays's deposition testimony that, in the event of a one-hundred-year storm, "the sewer network itself fills up very quickly and then the flow goes into the streets and the streets serve ... as the drainage channel," that the water ponds and travels in the TMC streets, and that streets serve as a "secondary conveyance system" when the storm sewers are full.

We note first that Mays clearly testified that, at the time Methodist and TWU flooded, Harris Gully was able to discharge properly and there was no back flow effect occurring in the streets of the TMC. To the extent Mays offered contradictory testimony that supports Methodist's theory, his testimony did not affirmatively establish that Methodist and TWU flooded as a result of a surcharge or back water effect from Braes Bayou or Harris Gully.

Second, as TWU notes in its reply brief, if we adopted Methodist's construction that surface water is no longer diffused surface water once it has been in any way "touched by the hands of man," section 11.086 would be rendered meaningless. Methodist's construction would require a party to show that water was diverted or impounded by a person, but that it had not been "touched by the hands of man."

Third, this "untouched by the hands of man" exception is not supported in the case law. In *Bunch v. Thomas,* 121 Tex. 225, 49 S.W.2d 421, 423 (1932), the Texas Supreme Court stated, in addressing the predecessor statute [7] to section 11.086:

> It is the settled law of this State that while under the statute quoted the lower estate must receive the surface waters naturally flowing thereon from a higher estate, yet it is not required to receive those waters except in their natural condition, untouched by the hands of man.

*Id.* The court in *Bunch* went on to hold that a lower landowner was entitled to maintain an embankment built to block water that poured onto her land through ditches cut into an adjoining tract of land by a neighboring landowner. *Id.* at 424. The court noted that the law could be correctly stated as follows:

7. The court quoted the predecessor statute, which provided:
> That it shall hereafter be unlawful for any person, firm or private corporation to divert the natural flow of the surface waters in this State or to permit a diversion thereof caused by him to continue after the passage of this Act or to impound such waters, or to permit the impounding thereof caused by him to continue after the passage of this

> Act, in such a manner as to damage the property of another, by the overflow of said water so diverted or impounded, and that in all such cases the injured party shall have remedies, both at law and in equity, including damages occasioned thereby.

*Bunch v. Thomas,* 121 Tex. 225, 49 S.W.2d 421, 423 (1932) (quoting Tex.Rev.Civ. Stat. Ann. art. 7589a).

Where the owner of higher lands constructs a ditch to drain the surface water therefrom, which increases the flow of water upon a lower proprietor, or which throws the water upon his land in a manner different from that in which it would have naturally flowed, to the latter's injury, it has been held that the former is liable for the injury thus occasioned.

*Id.* at 423. Thus, *Bunch* does not support the "untouched by the hands of man" exception suggested by Methodist. Nothing in *Bunch*, or any other authority which this Court is bound to follow, suggests that TWU is precluded from seeking to recover the damages it sustained by Methodist's impoundment or diversion of surface waters simply because these surface waters fell on an "artificial environment," such as the TMC.[8] Moreover, Methodist has not shown, as a matter of law, that the streets in the TMC, including those from which Methodist flooded, qualify as a watercourse under Texas law and, consequently, that any waters pooling or flowing in the TMC streets would automatically lose their classification as diffused surface waters.

We also address the distinguishable facts in *Dietrich*, which both parties cite extensively to support their opposite conclusions.[9] In *Dietrich*, the plaintiff asserted claims of negligence, trespass, and violation of section 11.086 against his neighbor who allegedly landscaped around and over a storm sewer on his property, occluding the storm drain and diverting water into the plaintiff's home on a neighboring lot. 123 S.W.3d at 416–17. Before the water was diverted, it had been "concentrated and directed toward the drain by a shallow, but readily visible, natural gully, that extended sixty feet or more into the wooded area." *Id.* at 419–20. The court stated that, under the law as it currently existed, a plaintiff had no cause of action "stemming from the diversion of water contained in a natural watercourse." *Id.* at 419. The court summarized its holding as follows:

When rain water fell ... on the night of the flood at issue, it undeniably possessed the character of surface water. When the water entered the channel

**8.** *See City of Houston v. Renault, Inc.,* 431 S.W.2d 322, 325 (Tex.1968) (noting that "at least with respect to urban property where conditions are constantly changing ... it is generally difficult or even impossible to establish how surface water flowed 'when untouched and undirected by the hand of man'"); *Muzquiz v. R.M. Mayfield & Co.,* 590 S.W.2d 742, 743–44 (Tex.Civ.App.-Houston [14th Dist.] 1979, writ ref'd n.r.e.) (stating that "[i]n an urban environment ... the natural flow may have been changed numerous times" and that "to force plaintiffs in such actions to prove the natural flow of surface water "untouched by the hand of man" in an urban setting, would frequently deprive such litigants of an adequate remedy"; further stating "it is the normal or natural flow of surface water at the time of diversion that should determine the rights of the parties in an urban area"); *but see Jefferson County Drainage Dist. v. Lower Neches Valley Auth.,* 876 S.W.2d 940, 950 (Tex.App.-Beaumont 1994, writ denied) (stating, "[t]he real thrust of section 11.086 ... speaks only to natural flow untouched by the hands of man and surface waters" and that "[s]urface waters do not remain surface waters when these waters enter into a channel that has been touched or modified by the hands of man").

**9.** Although we apply the definition of surface waters used by the majority in *Dietrich* and some of our other sister courts, we find merit in Justice Brister's dissent concerning the interpretation of section 11.086. *See Dietrich,* 123 S.W.3d at 422–24 (J. Brister, dissenting) However, because our holding that the trial court erred in granting Methodist's summary judgment motion would remain unchanged even if we applied the definition suggested by Justice Brister in his dissent, we decline the parties' invitation to address the dispute between the majority and the dissent in *Dietrich*.

leading to the storm sewer, however, its character changed.... Until it reached the blocked drain, the water was under the control and direction of a watercourse, and thus, it no longer qualified as surface water. As such, there was no diversion of *surface water* when the rain water was redirected from the drain inlet.

*Id.* at 420 (internal citations omitted).

■ Thus, the holding of *Dietrich* is actually limited to the fact that, under section 11.086, a landowner has no cause of action for damages arising from the diversion of a water flowing in a watercourse (in that case, a natural gully) because such waters are no longer diffused surface waters. *Id.* Here, as we stated above, Methodist did not establish, as a matter of law, that Methodist and TWU were flooded by waters flowing in a watercourse. Rather, TWU presented evidence creating a fact issue as to whether the waters that flooded it qualified as diffused surface waters.[10]

In sum, nothing in section 11.086 suggests that accumulated rainfall is no longer diffused surface water once it has been, in any way, diverted by artificial means or touched by the hands of man. *See Dalon*, 852 S.W.2d at 539 (stating, "[s]urface water loses its identity as surface water when it becomes a part of [a] creek whereas, in the cases cited by appellants, the surface water remains surface water since it is being diverted by artificial means.").

We sustain TWU's first issue.

### Negligence

In its second issue, TWU contends that the trial court erred in granting Methodist summary judgment on TWU's negligence claim because TWU "presented legally sufficient evidence to raise a duty under section 11.086 of the [Texas] Water Code, an undertaking theory, federal regulations, and general common-law principles."

■ First, we note that section 11.086 "imposes a duty of strict liability." *See Dietrich*, 123 S.W.3d at 424 (J. Brister, dissenting); *see also Bily v. Omni Equities, Inc.*, 731 S.W.2d 606, 611 (Tex.App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.) (stating that action based upon violation of section 11.086 is not dependent upon finding of negligence). Second, Methodist's assertion that the "key issue presented to this Court is simply whether the overland flows of water ... were surface water or flood waters," is disposed of by our previous holding that TWU raised a fact issue on this point. Thus, Methodist cannot defeat TWU's negligence claim, as a matter of law, on the basis that it did not owe a duty to control floodwaters because such waters were subject to the exclusive control of the State.

■ Thus, we turn to TWU's first proposed source of a negligence duty, an undertaking theory. The Texas Supreme Court has stated that "one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured thereby." *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex.1976). The court

---

10. *Dietrich* also casts doubt on Methodist's proposed exception for water "touched by the hands of man." As noted by the *Dietrich* court, the natural gully contained rain run off water from nearby tennis courts. Even though such water was undoubtedly "touched by the hands of man" when it drained from the tennis courts, the court based its conclusion that the waters were no longer diffused surface waters on the fact that "when the water entered the channel leading to the storm sewer, ... its character changed." *Id.* at 420.

in *Taylor* then cited section 323 of the Second Restatement of Torts, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

*Id.* at 119–20 (citing RESTATEMENT (SECOND) OF TORTS § 323 (1965)); *see also Torrington Co. v. Stutzman,* 46 S.W.3d 829, 838–39 (Tex.2000). Thus, to establish a negligent undertaking, a plaintiff must show (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection, (2) the defendant failed to exercise reasonable care in performing those services, and either (3) the plaintiff relied upon the defendant's performance, or (4) the defendant's performance increased the plaintiff's risk of harm. *Torrington Co.,* 46 S.W.3d at 838–39.

Here, TWU presented evidence that Methodist, through representatives, attended meetings prior to the storm to address concerns about possible flooding through tunnels that connected TMC institutions. Bussman, TWU's custodial maintenance supervisor, testified that, before the storm, he attended tunnel dwellers meetings with Methodist representatives and that the attending institutions, including Methodist, agreed to keep from flooding each other through the underground tunnels and passageways by protecting their perimeters. TWU depended upon Methodist's representations that it would install its flood logs and follow flood pre-

vention procedures to prevent the tunnels and TWU from flooding. Moreover, it was foreseeable that if Methodist did not protect it perimeter, TWU would flood. Bussman further testified that Methodist employees had agreed to protect their perimeter and strongly represented that they were prepared and vigilant. Again, TWU relied on Methodist to protect the tunnels and TWU.

TWU also presented the affidavit testimony of Labroski, Methodist's project coordinator, who testified that his responsibilities included coordinating flood protection planning and attending tunnel dwellers group meetings as an authorized representative of Methodist. At these meetings, the institutions discussed the potential for flooding from surface water through their perimeters and then into the tunnel system and the agreed triggers that the institutions would all use to respond to potential flooding. More specifically, Labroski testified that Methodist "[a]greed to immediately begin its ground level flood protection devices when the Harris County Box Culvert reached 7 feet," "[k]new that if Methodist did not protect its ground level perimeter from surface water" it would flood TWU and other institutions, and agreed to protect other institutions by protecting its surface level perimeters and the tunnel system from surface water runoff. He also noted that Methodist knew that it needed twenty-five to thirty people, working approximately two hours, to erect its flood protection devices. Based on his meetings with other Methodist employees after the storm, Labroski determined that the TMC gave Methodist warnings; that Methodist failed to timely respond to the warnings and its own flood observations; that Methodist failed to secure enough people and time to install its flood protection devices; and that as a result, surface water from the streets entered Methodist

and ultimately flowed to Favrot Hall and through the tunnel into TWU.

The above testimony provides at least some evidence that Methodist undertook to perform services that it knew or should have known were necessary for TWU's protection, that Methodist failed to exercise reasonable care in performing those services, that TWU relied upon Methodist's performance, and that Methodist increased TWU's risk of harm. We hold that TWU raised a fact issue as to whether Methodist owed TWU a duty under an undertaking theory. Accordingly, we further hold that the trial court erred in granting Methodist summary judgment on TWU's negligence claim. Having concluded that TWU raised a fact issue as to whether Methodist owed TWU a duty under an undertaking theory, we need not address TWU's arguments that it presented legally sufficient evidence to raise a duty under federal regulations and general common law.

We sustain TWU's second issue.

### Nuisance

■ In its third issue, TWU argues that the trial court erred in granting Methodist summary judgment on TWU's nuisance claim because TWU "raised a fact issue that Methodist had negligently and abnormally invaded its property interests."

■ A nuisance is "a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities." *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269 (Tex.2004); *Ronald Holland's A–Plus Transmission & Auto., Inc. v. E–Z Mart*

*Stores, Inc.*, 184 S.W.3d 749, 758 (Tex. App.-San Antonio 2005, no pet.). "To be actionable, a defendant must generally engage in one of three kinds of activity: (1) intentional invasion of another's interest; (2) negligent invasion of another's interests; or (3) other conduct, culpable because abnormal and out of place in its surroundings, that invades another's interest." *E–Z Mart Stores, Inc.*, 184 S.W.3d at 758.[11]

Methodist's summary judgment motion only asserted that because TWU could not show that Methodist owed any duty to TWU, TWU's nuisance claim necessarily failed. However, we have held that TWU raised a fact issue on its negligence claim, and the evidence supporting TWU's negligence claim against Methodist also supports its nuisance claim. Thus, we hold that the trial court erred in granting Methodist's summary judgment motion on TWU's nuisance claim.

We sustain TWU's third issue.

### Trespass

In its fourth issue, TWU argues that the trial court erred in granting Methodist summary judgment on TWU's trespass claim because TWU "proved Methodist knew with practical certainty that its conduct would cause the water on its premises to invade TWU's property." Methodist contends that it is not liable in trespass because TWU presented no evidence that Methodist intended or knew with a practical certainty that water would first enter and flood Methodist and that such water would leave Methodist and travel through

**11.** TWU did not argue below that Methodist was liable under a nuisance theory for conduct that was abnormal or out of place in its surroundings, and TWU may not raise this theory for the first time on appeal. *See* Tex.R.

Civ. P. 166a(c). Thus, our review is limited to the whether TWU raised a fact issue on its nuisance claim through either an intentional or negligent invasion.

a TMC tunnel into Favrot Hall, the Institute of Religion, and then flood TWU.

■■■■■ A claim for trespass to real property requires a showing of an unauthorized physical entry onto the plaintiff's property by some person or thing. *E–Z Mart Stores, Inc.*, 184 S.W.3d at 758. "The entry need not be in person but may be made by causing or permitting a thing to cross the boundary of a property." *Id.* To recover damages for trespass to real property, a plaintiff must prove that (1) the plaintiff owns or has a lawful right to possess real property, (2) the defendant entered the plaintiff's land and the entry was physical, intentional, and voluntary, and (3) the defendant's trespass caused injury to the plaintiff. *Wilen v. Falkenstein*, 191 S.W.3d 791, 798 (Tex.App.-Fort Worth 2006, pet. filed) (citing generally *Stone Res., Inc. v. Barnett*, 661 S.W.2d 148, 151 (Tex.App.-Houston [1st Dist.] 1983, no writ)).

■■■■ Concerning the intent element of the tort, the only relevant intent is that of the actor to enter the property. *Trinity Universal Ins. Co. v. Cowan*, 945 S.W.2d 819, 827 (Tex.1997); *see also Malouf v. Dallas Athletic Country Club*, 837 S.W.2d 674, 676 (Tex.App.-Dallas 1992, writ dism'd w.o.j.) (stating, "trespass is usually regarded as an intentional tort in the sense that it involves an intent to commit an act which violates a property right, or would be practically certain to have that effect, although the actor may not know that the act he intends to commit is such a violation").

■■■■ Here, TWU presented no evidence that Methodist intended to commit a trespass that violated TWU's property rights or would be practically certain to violate TWU's property rights. *See Gen. Tel. Co. v. Bi–Co Pavers*, 514 S.W.2d 168, 170 (Tex.Civ.App.-Dallas 1974, no writ).

Simply put, TWU presented no evidence that Methodist failed to timely install its flood protection devices and take other reasonable measures with the intent to flood both Methodist and TWU. TWU's allegations concerning Methodist's failure to act are necessarily based on Methodist's negligence in failing to take proper flood prevention procedures, not on an intentional act. Thus, TWU is properly relegated to negligence-based actions and its action for a violation of section 11.086 of the Texas Water Code. Accordingly, we hold that the trial court did not err in granting Methodist summary judgment on TWU's trespass claim.

We overrule TWU's fourth issue.

## Conclusion

We affirm the trial court's summary judgment in favor of Methodist on TWU's trespass claim, and we reverse the trial court's summary judgment in favor of Methodist on TWU's claim for violation of section 11.086 of the Texas Water Code, negligence, and nuisance. We remand for further proceedings consistent with this opinion.